[Cite as *State v. Foreman*, 2014-Ohio-626.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                          :

    Plaintiff-Appellee                              :           C.A. CASE NO.     25809

v.                                                         :           T.C. NO.     12CR2689

SAMMIE L. FOREMAN                             :           (Criminal appeal from
                                        Common Pleas Court)
    Defendant-Appellant                          :

                                              :

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____21st_____ day of _____February_____, 2014.

. . . . . . . . . .

APRIL F. CAMPBELL, Atty. Reg. No. 0089541, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

KATE L. BOWLING, Atty. Reg. No. 008442, 111 W. First Street, Suite 518, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

     **{¶ 1}**   This matter is before the Court on the Notice of Appeal of Sammie L.

Foreman, filed July 7, 2013.  Foreman appeals from his June 25, 2013 judgment entry   of

conviction, following pleas of no contest[1], to one count of possession of cocaine (27 grams but less than 100 grams), in violation of R.C. 2925.11(A), a felony of the first degree, and one count of possession of heroin (one gram but less than five grams), in violation of R.C. 2925.11(A), a felony of the fourth degree. We hereby affirm the judgment of the trial court.

{¶ 2} Foreman was indicted on September 14, 2012, and he pled not guilty on September 18, 2012. On September 27, 2012, Foreman filed a motion to suppress. At the March 29, 2013 hearing thereon, Officer Daniel Perry of the Dayton Police Department testified that on September 5, 2012, at approximately 1:00 to 1:30 a.m., while on routine patrol, he and his partner, Officer Kyle Watts, were dispatched to 569 St. Paul Street, in Dayton, on the report of a stolen television. According to Perry, the complainant, Alfred McCloud, advised the officers that Raymond Walters had been staying at McCloud's residence until McCloud told him to leave because of Walters' drinking problem. Perry stated that McCloud further advised the officers that McCloud "left to go to the store. When he came back, his TV was gone." Perry stated that McCloud believed that the television "might be at 848 Clover [Street]. Not sure what apartment, but [he] knows that the apartment is upstairs."

{¶ 3} Perry testified that he, Watts, and McCloud, proceeded to the Clover Street address, which Perry described as "a two story rooming house. It has approximately * * * 8 to 12 units in there, just single room apartments." Perry stated that while he and Watts were knocking on the front door of the building, McCloud "came around from the building and

---

[1] We note that Foreman's judgment entry of conviction erroneously indicates that Foreman entered guilty pleas to the indicted offenses.

said that a black male just jumped out the back window and took off running." Perry stated that he and Watts proceeded to the back of the rooming house, and that they did not see anyone. He stated that they were unable to make contact with anyone inside the building, that they "searched the area looking for the person that ran and couldn't find him, so we ended the call."

{¶ 4} Perry stated that at approximately 3:02 a.m. on the same day, he and Watts again responded to the St. Paul Street address to meet with McCloud. According to Perry, McCloud "stated that he just received word from the alleged suspect, Raymond Walters, that his TV is inside of 848 Clover in Jay's apartment. I'm not sure which number, but it's upstairs." Perry stated that the officers and McCloud returned to the Clover Street address. Upon arrival, Perry stated that he observed a "resident or a friend of a resident who was trying to get into the apartment and she was trying both doors. She was unsuccessful in getting in, so we started pounding on the doors again trying to get someone to answer * * * ." Perry stated that they knocked on the back door. He stated that "we weren't shouting or anything." Perry stated that no one responded to the loud knocking.

{¶ 5} The following exchange occurred:

Q. What happens next, sir?

A. We're knocking on the back door. Officer Watts and I hear noises on the back side of the building again. Because we know that someone jumped out the last time we walked around the back side of the building. Officer Watts was in front of me. When I came around, I saw a subject on the ground crouched and he takes off running * * * .

Q. Is that subject who was on the ground crouched, was that right below a window - -

A. Yes.

* * *

Q. You didn't see him jump from that window, is that correct?

A. That's correct.

* * *

Q. Do you know whether Officer Watts saw him jump from the window?

* * *

A. Officer Watts was in front of me. He stated that he did see him jump from the window.

* * *

Q. What happens next?

A. The subject takes off running. Officer Watts yells, "Police, stop," and we pursued the subject.

Q. * * * Did you find it suspicious when you saw this individual where he was crouched down below the window?

A. Yes.

Q. Why did you find it suspicious?

A. Because the first time when Alfred said that a black male jumped from the window and we heard the noises and we were there trying to find a

TV related to a burglary and he obviously jumped out of the window again.

{¶ 6} Perry stated that he was 15 to 20 feet from the subject, and that Watts was probably "about 10 to 15" feet from the subject when the officers observed him. Perry stated that when the subject began to run, Watts immediately identified himself as a police officer and shouted at him to stop. Perry stated that he did not have any trouble hearing Watts shout at the subject. Perry stated that the subject continued to run. Perry identified Foreman as the man he observed crouching under the window who fled from the officers.

{¶ 7} Perry stated that he "called out the pursuit" on the radio, and that Officer McReynolds radioed in response that he observed Foreman running in an alley. Perry stated that he ran towards McReynolds' location. Perry testified that "Officer McReynolds states he hears noises in the backyard and at that time he sees - - they see Sammie Foreman coming over the fence." Perry stated that Officer Ward apprehended Foreman, and when Perry "came around the front of the house they were just finishing cuffing him."

{¶ 8} Perry stated that Foreman was taken into custody without incident, and that Foreman "stated that, spontaneous utterance, he stated that he ran because he has a child support warrant. And at that time, I said, 'Regardless you're going to jail for - - you're under arrest for obstruction' " of official business. Perry stated that no one posed a question to Foreman prior the statement. When asked to define Foreman's offense, Perry stated, "While trying to investigate a burglary, taking off running * * * from the apartment we're trying to get into and not stopping when Officer Watts identified himself as a police officer and continuing to run."

{¶ 9} Following his arrest, Perry stated that Officer Curnett brought Foreman to

the sidewalk and "started going through his pockets, search incident to arrest." Perry stated that a baggie containing a "large rock of what appeared to be crack cocaine" was retrieved from Foreman's "right front pocket." Perry stated that Foreman also had a second bag of crack cocaine and "a little bit of heroin" on his person also. Perry stated that Foreman was placed in a cruiser and it was confirmed that he had an active warrant.

{¶ 10} On cross-examination, Perry stated that Foreman's warrant "was for a child support." He stated that Dayton police officers are "all very familiar with Raymond Walters," who is "approximately 5'7" to 5'8", 180, 190 white male, bald hair." Perry stated that he knows Walters on sight. He stated that when he observed Foreman, he knew that Foreman was not Walters. Perry stated that McCloud told him that he believed the television was in "the apartment of a guy named Jay which was described as a black male." Perry stated that he does not know Jay's identity. Perry stated that McCloud described the man he initially observed jump out the window as "a black male wearing blue jeans and red shoes, no shirt." Perry stated that he believed that Foreman jumped out of the window that Perry observed him crouching beneath. He stated that the window is probably 10 or 12 feet off of the ground, and that the window "wasn't like a normal location for a normal window, like maybe a small window for a bathroom or something." Perry stated that he observed that Foreman was not wearing a shirt, and that he wore blue jeans and red shoes. Perry stated that officers never recovered a television or located Walters. Perry stated that McCloud advised him that "the last time his TV was stolen it had ended up being in [']Crybaby's['] apartment in that same building."

{¶ 11} On redirect, Perry stated that McCloud told him that "Crybaby" is a black

male.   The following exchange occurred:

Q.   And then too, Mr. Hodge was asking you, Mr. McCloud thought that this white male is the one that had taken the TV, is that correct?

A.   Yes.

Q.   But then you had information that the TV might actually be in this black male's place at 848 Clover Street, is that right?

A.   Correct.

Q.   Would you be interested in talking to an individual that potentially had stolen property in their apartment if you were investigating a case such as this?

A.   Yes.

{¶ 12}   The following exchange occurred on recross-examination:

Q.   You say you gained information that the TV might be in a black male's apartment.   From whom did you gain that information?

A.   Alfred McCloud told us that Raymond Walters, the alleged suspect who stole the TV went to that apartment and traded it for - -

Q.   Went to what apartment?

A.   The 848 Clover.

Q.   Which apartment?

A. They do not know.   They did not mention which apartment.

{¶ 13}   Officer Kyle Watts testified that he has been with the Dayton Police Department since February, 2012.   He testified that on his and Perry's second trip to the

Clover Street address that a "female who said she lived at 848 Clover Street had been knocking on the door. And at that time I heard noise on the south side of the residence." He stated that when he "heard the noise, I go to the south side of the building and I see a black male with no shirt wearing dark pants and red shoes jumping from a - - the first floor window." Watts stated that the window was "significantly higher than most first floor windows," and that the behavior he observed was suspicious because "[a]ny reasonable person would not be jumping out of a window when the police are near the front door." Watts stated that he "yelled, 'Police, stop,' at about ten feet away and he continues to run south on St. Paul [A]venue." Watts stated that Perry "used his portable radio and tells dispatch and other crews that we're pursuing one on foot and get his direction of flight." Watts stated that when he arrived at Foreman's location, Foreman was already in handcuffs. Watts stated that in Foreman's "right front pant pocket after search incident to arrest for obstructing official business, they located two clear sandwich baggies, plastic sandwich baggies, later identified as cocaine."

{¶ 14} Foreman testified that at about 3:00 a.m. on September 5, 2012, he was at 848 Clover Street, in the common area of the building. He stated that he was visiting his cousin, Jerry Nicholson, who stays there. He stated that he had arrived "maybe about 2:00," and that he "had heard about the whole situation with the TV." Foreman stated, "somebody knocked on the door," and he "thought it was my cousin. A couple of guys come to the door and they was asking me about a TV I know nothing about. It was like four white guys. And I'm like, 'I know nothing about it.' * * * I wasn't whoever they were looking for." Foreman stated the knock was at the rear door. He stated that the men were "kind of

brawly, kind of." He stated that the men were "[k]ind of loud," and that they "looked kind of rough." He stated that he "told them I know nothing about it. And at that point I shut the door and I got out of there. That's when I went out the window."

{¶ 15} When asked to further describe the men, Foreman testified as follows:

You know, they was drunk and cussing. And I mean I understood. Somebody wants their TV back and I understand. So you know, I didn't curse them out. I didn't do anything. I just told them I know nothing about it, you know. As far as I know, they said they were going to stay there until they got access to it or got it back or whoever. I said, "Okay. That's fine with me. It has nothing to do with me." But the way they were looking and kind of acting, I felt like it could have been a problem and I wanted to avoid it. That's what I tried to do.

{¶ 16} Foreman stated that he went out the "common area window" after he shut the door. He stated that once out of the window, he "took off running because I thought I heard somebody yelling at me and I thought it was them and I took off." He stated that by "the time I hit the ground, I thudded and took off. It was like a quick action." Foreman stated that he did not hear anyone yell, " 'Stop, police.' " He stated that he did not observe any police cruisers or officers. Foreman testified that he ran to Nassau Street where he observed "several police cars actually in that area," and "that's where they got me." Foreman stated, "[o]nce they walked up on me and said stop, I stopped." He stated, "I never had a child support warrant." He stated that he ran not because of a warrant but because "some guys came threatening about a TV and stuff they were going to do and I got

out of the way." He stated that he did not know the police were present at the Clover Street address when he fled. He stated that when he jumped out of the window, he was wearing a red hat, red shirt, blue jeans, and red shoes. Foreman denied jumping out of the window earlier in the morning, and he stated that he previously "was out actually drinking and partying." Foreman stated that his cousin, Jerry, left the building right after Foreman arrived, and that Foreman was "kicking it" there when the men arrived looking for the television.

{¶ 17} In overruling Foreman's motion to suppress, the trial court noted that it found the testimony of the officers credible in all respects, and that Foreman's "version of the evening's events is utterly incredible." The trial court then determined as follows:

> The Officers were at the Apartments to investigate reports that a black male living at the Apartments had McCloud's television. While attempting to gain access to the Apartments to further the investigation, Officer Watts observed Defendant jump from a window, just as McCloud had reported at the time of the earlier visit by the Officers that evening.

> The Officers characterized Defendant's jumping out of the window while they were pounding at the back door as "suspicious." No kidding. Observing Defendant jump from the window and run despite their orders to stop gave the Officers probable cause to detain and arrest Defendant as discussed above. And, in any event, even were there no basis for Defendant's arrest for a violation of R.C. § 2921.31, once properly detained by the Officers and the Officers' verifying an active warrant for his arrest, the

Officers were within their rights to arrest Defendant on that basis alone.

And thus the Officers' search of Defendant was proper in all respects as incident to his lawful arrest.

{¶ 18} Foreman asserts one assignment of error as follows:

"THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AS THERE WAS NO REASONABLE SUSPICION TO DETAIN OR PROBABLE CAUSE TO ARREST APPELLANT."

{¶ 19} As this court has noted:

In addressing a motion to suppress, the trial court assumes the role of the trier of fact. *State v. Morgan*, 2d Dist. Montgomery No. 18985, 2002-Ohio-268, citing *State v. Curry*, 95 Ohio App.3d 93, 96, 641 N.E.2d 1172 (8th Dist.1994). The court must determine the credibility of the witnesses and weigh the evidence presented at the hearing. *Id.* In reviewing the trial court's ruling, an appellate court must accept the findings of fact made by the trial court if they are supported by competent, credible evidence. *Id.* However, "the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." *Id.*

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable

suspicion that criminal activity may be afoot. *State v. Martin*, 2d Dist. Montgomery No. 20270, 2004-Ohio-2738, ¶ 10, citing *Terry*. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). The officer must have more than an inchoate hunch or suspicion to justify an investigatory stop. *State v. Chase*, 2d Dist. Montgomery No. 25323, 2013-Ohio-2347, ¶s 15-16.

{¶ 20} As the U.S. Supreme Court determined:

[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion. * * * Headlong flight - wherever it occurs - is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior. * * * *Illinois v. Wardlow*, 528 U.S. 119, 124-25, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000).

{¶ 21}  "In order to have probable cause for an arrest, a police officer must be aware of facts sufficient to create a fair probability that the person to be arrested committed a crime. *State v. McCoy*, Montgomery App. No. 20006, 2004-Ohio-5833, at ¶ 16, citing *Beck v. Ohio* (1964), 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142."  *State v. Glenn*, 2d Dist. Montgomery No. 24614, 2011-Ohio-6703, ¶ 6.

{¶ 22}  R.C. 2921.31 provides: "(A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties."  "'Fleeing from a police officer who is lawfully attempting to detain the suspect . . ., is an affirmative act that hinders or impedes the officer in performance of the officer's duties as a public official and is a violation of R.C. 2921.31, obstructing official business.'" *State v. Branham*, 2d Dist. Montgomery No. 22480, 2008-Ohio-5158, ¶ 10.

{¶ 23}  We initially note that we defer to the trial court's determination that Officers Perry and Watts were credible witnesses, and that Foreman's testimony was not credible. On their initial visit to the Clover Street address, McCloud advised the officers that he observed a shirtless black male, wearing blue jeans and red shoes, jump out of a rear window of the rooming house and flee while officers knocked on the door.  McCloud told Perry that he believed his television was in the apartment of a black male named Jay, who was unknown to Perry.  When the officers returned to the rooming house, Watts observed a shirtless black male wearing dark pants and red shoes jump out of the same rear window and flee.  Both officers described Foreman's behavior as suspicious given their presence and efforts to gain entrance to the building to investigate a theft.

**{¶ 24}** Under the totality of the circumstances, namely that the officers were looking for a stolen television allegedly in the possession of a black male at the Clover Street address, and that a shirtless black male in dark pants and red shoes had twice fled from the address in the officers' presence, we conclude that Foreman's evasive conduct was suggestive of wrongdoing, and that the officers had a reasonable, articulable suspicion of criminal activity when Watts yelled for Foreman to stop. When Foreman fled after the officers attempted to detain him, he hindered their investigation into the theft of McCloud's television, in violation of R.C. 2921.31, and the officers had probable cause to arrest him. Accordingly, the subsequent search of his person was properly conducted. *Chase*, ¶ 31 ("Another exception to the general prohibition against warrantless searches is a search incident to a lawful arrest. *Chimel v. California*, 395 U.S. 752, 762-63, 89 S.Ct. 2034, 23 L .Ed.2d 685 (1969)." Therefore, the trial court did not err in overruling Foreman's motion to suppress.

**{¶ 25}** There being no merit to Foreman's assigned error, it is overruled. Judgment affirmed.

. . . . . . . . . .

FROELICH, P.J. and FAIN, J., concur.

Copies mailed to:

April F. Campbell
Kate L. Bowling
Hon. Steven K. Dankof