THE STATE OF OHIO, APPELLANT, *v.* ANDREWS, APPELLEE.

[Cite as State *v.* Andrews (1991), 57 Ohio St. 3d 86.]

(No. 89-2107—Submitted November 28, 1990—Decided January 23, 1991.)

*Lee C. Falke,* prosecuting attorney, and *Lorine M. Reid,* for appellant.

*Debra L. Landon,* for appellee.

*Randall M. Dana,* Ohio public defender, and *John A. Bay,* urging affirmance for *amicus curiae,* Ohio Public Defender.

H. BROWN, J. This case requires us to determine whether Officer Martin had a reasonable suspicion to justify his investigative stop and protective search of Andrews. For the reasons set forth below, we hold that Martin's "stop and frisk" of Andrews was reasonable and reverse the court of appeals.

The Fourth and Fourteenth Amendments to the United States Constitution prohibit any governmental search or seizure, including a brief investigative stop, unless supported by an objective justification. *United States v. Cortez* (1981), 449 U.S. 411, 417; *Reid v. Georgia* (1980), 448 U.S. 438, 440; *Terry v. Ohio* (1968), 392 U.S. 1, 19.[1] In determining the propriety of Martin's conduct, we must analyze: (1) the investigatory stop, and (2) the protective search. The analysis is governed by the standards enunciated in *Terry v. Ohio, supra,* and its progeny. We recognize that the circumstances of this case (as to both the stop and the frisk) present a close question of fact. The law does not and cannot provide bright lines or easy answers in a case such as this. Having recognized the difficulty, we will first examine the investigatory stop of Andrews by Martin.

In *Terry,* the United States Supreme Court held that a police officer may stop and investigate unusual behavior, even without probable cause to arrest, when he reasonably concludes that the individual is engaged in criminal activity. In assessing that conclusion, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. Furthermore, the standard against which the facts are judged must be an objective one: "[W]ould the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21-22.

Since *Terry,* courts have struggled with the elusive concept of what comprises a reasonable suspicion that someone is engaging in, or about to engage in, criminal activity. "Terms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise." *Cortez, supra,* at 417. Fleshing these terms out, courts have concluded that an objective and particularized suspicion that criminal activity was afoot must be based on the entire picture — a totality of the surrounding circumstances. *Id.* at 417-418; *State v. Bobo* (1988), 37 Ohio St. 3d 177, 524 N.E. 2d 489; *United States v. Rickus* (C.A. 3, 1984), 737 F. 2d 360, 365. Furthermore, these circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must

---

[1] A review of Ohio case law indicates that we have interpreted Section 14, Article I of the Ohio Constitution to protect the same interests and in a manner consistent with the Fourth Amendment to the United States Constitution. *State v. Lindway* (1936), 131 Ohio St. 166, 5 O.O. 538, 2 N.E. 2d 490; *State v. Burkholder* (1984), 12 Ohio St. 3d 205, 12 OBR 269, 466 N.E. 2d 176.

react to events as they unfold. *United States* v. *Hall* (C.A. D.C. 1976), 525 F. 2d 857, 859; *State* v. *Freeman* (1980), 64 Ohio St. 2d 291, 295, 18 O.O. 3d 472, 474, 414 N.E. 2d 1044, 1047. A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by those in law enforcement. *Cortez, supra.*[2]

The state urges that Martin's investigative stop of Andrews was reasonable under the standards set in the foregoing cases. Specifically they point to five factors: (1) the investigative stop took place in a high crime area, (2) it occurred at night and in a dark area, (3) Martin had twelve and a half years' experience on the police force, (4) Martin was away from his police cruiser and alone at the time of the stop, and (5) Martin saw the defendant running away from the direction of a police cruiser and into the dark courtyard.

We believe that the facts support a reasonable suspicion by Martin that Andrews was engaged in criminal activity. Martin was an experienced police officer with twelve and a half years on the force and was familiar with the Roland Circle area. We must view the circumstances of the stop through his eyes. He was the " 'reasonable and cautious police officer on the scene' " who is guided by his own experience and training. *Freeman,* *supra,* at 295, 18 O.O. 3d at 474, 414 N.E. 2d at 1047; *United States* v. *Hall, supra,* at 859.

The stop took place in an area high in drug activity, violence, and weapons-related crime. An area's reputation for criminal activity is an articulable fact which is a part of the totality of circumstances surrounding a stop to investigate suspicious behavior. *Bobo, supra,* at 179, 524 N.E. 2d at 491; *Freeman, supra.* See, also, *United States* v. *Magda* (C.A. 2, 1976), 547 F. 2d 756, 758, certiorari denied (1977), 434 U.S. 878.

Finally, Martin observed a man running between two apartment buildings, into a dark courtyard, and (from the point of view of Martin) away from a police cruiser. When the suspect saw the officer he suddenly stopped and threw down what he was carrying in his hand.

This case cannot be resolved on the basis of any one of the factors we have enumerated. However, when taken collectively, those factors indicate that Martin did not violate constitutional rights in stopping and investigating Andrews' behavior.

"The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause for arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the

---

[2] In *Cortez,* the United States Supreme Court explained an assessment of the circumstances in their entirety as follows: "The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions — inferences and deductions that might well elude an untrained person.

"The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same — and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *Cortez, supra,* at 418.

contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response." *Adams* v. *Williams* (1972), 407 U.S. 143, 145. In this case a brief stop of Andrews, while Officer Martin determined his identity, was reasonable.

Having determined that the stop was reasonable, we must next determine whether Martin was entitled to frisk Andrews. The frisk, or protective search, approved in *Terry* is limited in scope to a pat-down search for concealed weapons when the officer has a reasonable suspicion that the individual whose behavior he is investigating at close range may be armed and dangerous. *Terry, supra,* at 27. While probable cause is not required, the standard to perform a protective search, like the standard for an investigatory stop, is an objective one based on the totality of the circumstances. *Id.* The rationale behind the protective search is to allow the officer to take reasonable precautions for his own safety in order to pursue his investigation without fear of violence. *Terry, supra,* at 24, 30. See, also, *Adams, supra,* at 146; *State* v. *Williams* (1990), 51 Ohio St. 3d 58, 62, 554 N.E. 2d 108, 112; *United States* v. *Smith* (C.A. 6, 1978), 574 F. 2d 882, 885.

Based on an analysis of the totality of the circumstances, we hold that Martin had a reasonable objective basis for frisking Andrews. Martin was in a dark, unlighted courtyard, alone and away from his cruiser. He abruptly encountered Andrews running between two buildings and apparently away from a police cruiser. Andrews stopped and made a quick movement, throwing onto the ground what he had been carrying in his hand. Martin knew that he was in a high crime area, in which violence and weapons-related crime were common. His suspicion that Andrews was engaged in criminal activity also warranted a belief that Andrews might be armed and dangerous.[3] "* * * We cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest." *Terry, supra,* at 24. Therefore, Martin's need to provide for his safety entitled him to conduct a limited frisk of Andrews for weapons.[4]

We therefore reverse the judgment of the court of appeals and reinstate appellee's conviction and sentence.

*Judgment reversed.*

MOYER, C.J., HOLMES, DOUGLAS and RESNICK, JJ., concur.

SWEENEY and WRIGHT, JJ., dissent.

WRIGHT, J., dissenting. A citizen's Fourth Amendment rights are the same regardless of his residence, station in life or where he happens to be when he encounters a police officer. The majority has repeated the error announced in *State* v. *Bobo* (1988), 37 Ohio St. 3d 177, 524 N.E. 2d 489, as to the concept of a "high crime area" exception to the Fourth Amendment. See *Bobo* at 182, 524 N.E. 2d at 493-494,

---

[3] In *Terry,* the court recognized that "American criminals have a long tradition of armed violence" and that every year law enforcement officers are killed or wounded in the line of duty. *Terry, supra,* at 23.

[4] Andrews does not contend that the scope of Martin's search exceeded the limited pat-down for weapons allowed by *Terry, supra,* at 27, so we need not address that issue.

Wright, J., dissenting. The majority grounds its case in the "stop and frisk" procedure permitted by *Terry* v. *Ohio* (1968), 392 U.S. 1. It then proceeds to graft innovations onto that procedure until the original concept is completely obscured. It was precisely that kind of analysis that resulted in a summary reversal by the United States Supreme Court in *Smith* v. *Ohio* (1990), 494 U.S. ____, 108 L. Ed. 2d 464, 110 S. Ct. 1288, involving another questionable search and seizure.

The majority acknowledges that this case presents a "close question of fact." As such, it is worth noting the salient facts in *Terry*. The officer who conducted the "stop and frisk" had thirty-nine years' experience, thirty-five as a detective. (The officer in the instant case, while hardly a rookie, had less than a third that amount of experience.) Further, the detective in *Terry* watched at length while two suspects each made repeated trips up and down the sidewalk, stopping en route each time to peer into the same store window and then confer with each other. Based on his own lengthy experience and the observed conduct, the detective became convinced that the two men were planning to rob the store. He further surmised that if they were planning a holdup, one or both men were armed.

Compare those facts, if you will, with the ones cited by the state in the instant case and relied on by the majority in deciding that Officer Raymond Martin was justified in stopping and searching Christopher Andrews.

Martin was alone, in a dark courtyard, in a high crime area, when he saw a man running. Martin also saw a police cruiser driving nearby and thought the man might be running away from the cruiser. (This point is never pursued further, though it seems to loom large in the majority's thinking about the propriety of what happened next.) When the running man was about ten feet away, Martin shined his flashlight on the man. The man immediately threw down the can of beer he was carrying. This movement, too, takes on sinister proportions in the majority's view. Martin then pulled out his gun and grabbed the man. After telling the man to keep his hands up, Martin holstered his gun and conducted a frisk, finding a small automatic pistol in Andrews' back pants pocket.

The United States Supreme Court, in *Terry*, noted: "A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." *Terry* at 25-26. And what were those "exigencies" in this case?

A veteran police officer found himself alone in the dark in a high crime area with a man running towards him.

There is an alternative explanation for what occurred that just as easily fits these facts, but with a different result when the dictates of the Fourth Amendment and *Terry* are followed.

A veteran police officer, caught off guard by a running man, acts to defend himself from a potential threat. He shines his flashlight on that threat, tells the man to put his hands up and pulls out his gun. The "threat" turns out to be a man with a beer can. Nothing more. The man has stopped abruptly and thrown down his beer. Hardly the kind of suspicious activity that would warrant a frisk! There is nothing in the facts that reveals a conversation at this point. Andrews is standing there with his hands up, at Martin's order. Now, this veteran officer, alone in a dark courtyard in a high crime area with a man the majority says was

engaging in suspicious activity, grabs the man, *holsters his weapon* and searches him. *Terry* permits a search for weapons, without probable cause for arrest, where the officer "has reason to believe that he is dealing with an armed and dangerous individual * * *." *Terry* at 27.

Given the location, the time of night and the fact that Martin was alone, it stretches credibility beyond reasonable limits to argue that the officer would holster his weapon if he had had any belief that he was confronting an "armed and dangerous individual."

The permissible "stop and frisk" in *Terry* occurred after considerable surveillance. This court, in *Bobo,* noted that the officers had had time to observe the defendant's purportedly suspicious behavior inside his car. In the instant case, the time lapse from initial observation to search could probably have been measured in heartbeats (escalating, no doubt, geometrically between the "stop" and the "frisk").

If that kind of time frame and those circumstances are to become the bases for analyzing the reasonableness of future searches, of what value is the Fourth Amendment? Little, I think, and I must therefore vigorously dissent.

SWEENEY, J., concurs in the foregoing dissenting opinion.