[Cite as *State v. Stocks*, 2019-Ohio-2944.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28191 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-1835 |
| | : | |
| CHARLES F. STOCKS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 19th day of July, 2019.

. . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Atty. Reg. No. 0095826, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

SUSAN F. SOUTHER, Atty. Reg. No. 0058529 and JACOB S. SEIDL, Legal Intern, 117 South Main Street, Suite 400, Ohio 45422
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} After the trial court overruled his motion to suppress, Charles F. Stocks pled no contest to aggravated possession of drugs, a felony of the fifth degree. The trial court sentenced him to community control. Stocks appeals from his conviction, claiming that the trial court erred in denying his motion to suppress. For the following reasons, the trial court's judgment will be reversed, and the case will be remanded for further proceedings.

## I. Factual and Procedural History

{¶ 2} The evidence at the suppression hearing consisted of the testimony of Dayton Police Officer Jonathan Rudy, a video-recording from Rudy's cruiser, and maps of the area offered by the defense. The evidence established the following facts.

{¶ 3} On June 13, 2017, Officer Rudy was part of the Community Problem Response Team, pursuant to which he was assigned to address a particular neighborhood's complaints; the complaints oftentimes related to drug houses or problems with drugs in the neighborhood. Rudy described his assigned neighborhood as a "high drug and crime area."

{¶ 4} At approximately midnight on June 13, Officer Rudy was headed northbound on South Garfield Street, a residential street, in a marked cruiser, when he observed Stocks walking eastbound on McKinley Street toward the cruiser. Rudy saw Stocks "rapidly change directions to go south into an alley that sits along 30 McKinley." (Tr. at 8.) When asked if he saw anything else about Stocks or his movements, Officer Rudy responded, "Just that he was walking extremely fast." (Tr. at 9.) Rudy later stated that Stocks was "pretty close to running," but not running.

{¶ 5} Officer Rudy turned around on South Garfield Street and headed

southbound. He testified that he "wanted to stop and talk to Mr. Stocks. I believed at that point that he was trying to evade me and evade any contact with police." (Tr. at 10.) Officer Rudy encountered Stocks, walking eastbound, at the corner of South Garfield and East Fourth Street. Officer Rudy stated that when the cruiser became visible, Stocks put his right hand down into his right pocket. Rudy pulled up beside Stocks and exited the cruiser to made contact with Stocks, who was then walking past the passenger side of the cruiser. Officer Rudy did not have his overhead lights on, nor did he use his spotlight. According to Officer Rudy, he did not know Stocks prior to that day and did not observe Stocks committing any criminal act.

{¶ 6} Stocks stopped walking when Rudy got out of his cruiser. Officer Rudy told Stocks to "put his hands up for me" due to officer safety concerns. (Tr. at 13-14.) The officer then asked Stocks for his name, to which Stocks responded, "Freddie."[1] Stocks then put his left hand into his left pocket, and Officer Rudy again told Stocks to take his hands out of his pockets. Stocks indicated that he did not have identification with him. When asked at the suppression hearing what he intended to do with Stocks's identification, Officer Rudy testified, "Just run him through records. Make sure he wasn't wanted, anything like that." (Tr. at 16.)

{¶ 7} Officer Rudy asked Stocks if he (Stocks) had anything that would poke or stick the officer. Stocks responded that he did not have anything. The officer then asked Stocks for consent to search Stocks's pockets. Officer Rudy testified that Stocks nodded, giving his consent. The trial court found that the cruiser camera recording did

---

[1] The trial court noted that Freddie is not Stocks's legal name. The record reflects that Stocks told Officer Rudy that "Freddie" is the name he is commonly called, and that Stocks then told the officer his full name.

not show that Stocks gave any audible response to the request to search, and that it showed that Officer Rudy touched Stocks's elbow prior to asking his consent to search. The recording further showed that Stocks had a cigarette pack in his hand, and that he lit and smoked a cigarette when Officer Rudy searched him. Rudy testified that he did not restrain Stocks in any way, but Stocks was not free to leave.

{¶ 8} Although not discussed at the suppression hearing, Officer Rudy located drugs on Stocks's person. The following month, Stocks was indicted for aggravated possession of drugs, i.e., carfentanil, in violation of R.C. 2925.11(A).

{¶ 9} On July 23, 2018, Stocks moved to suppress the evidence against him. He claimed that the stop and search violated his constitutional rights, as the officer did not have reasonable suspicion that he was engaged in any criminal activity. He further claimed, generally, that any statements he made were involuntary and in violation of his Fifth Amendment rights. The court held an evidentiary hearing, and the parties filed post-hearing memoranda.

{¶ 10} On September 19, 2018, the trial court overruled the motion to suppress. The trial court concluded that the encounter between Stocks and Officer Rudy was an investigatory stop, that Officer Rudy had a reasonable articulable suspicion of criminal activity to justify the stop, and that Stocks consented to the search of his person.

{¶ 11} In his sole assignment of error, Stocks claims that the trial court erred in denying his motion to suppress.

## II. Review of Suppression Ruling

{¶ 12} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate

the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 13} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry*, police officers may briefly stop and/or temporarily detain individuals in order to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot. *Id.*; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991); *State v. Hairston*, Ohio Slip Opinion No. 2019-Ohio-122, __ N.E.3d __, ¶ 10.

{¶ 14} The Ohio Supreme Court recently emphasized that "[a]n assessment of the totality of the circumstances 'does not deal with hard certainties, but with probabilities.' We consider the cumulative facts 'not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.' " *Hairston* at ¶ 10, quoting

*United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Moreover, the existence of reasonable suspicion is determined "based on the *collection* of factors, not on the individual factors themselves." (Emphasis sic.) *Hairston* at ¶ 15, quoting *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 19.

**{¶ 15}** Nevertheless, the officer must have more than an inchoate and unparticularized hunch or suspicion to justify an investigatory stop. *State v. Belvin*, 2d Dist. Montgomery No. 25987, 2014-Ohio-3634, ¶ 8; *Terry* at 22. "[T]he Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

**{¶ 16}** At the outset, the trial court found that Officer Rudy initiated an investigatory stop when he got out of his cruiser and told Stocks to take his hand out of his pocket. The State does not dispute the trial court's finding that the encounter was a *Terry* stop, rather than a consensual encounter, and we likewise agree with the trial court's conclusion.

**{¶ 17}** We therefore turn to whether Officer Rudy had a reasonable articulable suspicion of criminal activity to justify the stop. As we stated in *State v. Thomas*, 2d Dist. Montgomery No. 20643, 2005-Ohio-3064:

Many factors such as the suspect's presence in an area known to be a high crime area, furtive gestures or movements by the suspect, or unprovoked flight upon seeing police officers, while standing alone may be insufficient to support a reasonable suspicion of criminal activity and justify an investigative stop. Nevertheless, these are relevant considerations in determining whether the totality of the facts and circumstances are

sufficiently suspicious to justify a *Terry* stop. *Illinois v. Wardlow* (2000), 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570; *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489; *State v. Williams* (Dec. 24, 2004), Montgomery App. No. 20421. While these factors are not necessarily indicative of criminal behavior and can be consistent with innocent conduct, *Terry* recognized that officers may briefly detain individuals to resolve ambiguity in their conduct. *Wardlow*, supra.

*Thomas* at ¶ 14.

{¶ 18} In concluding that Officer Rudy had a reasonable articulable suspicion of criminal activity, the trial court reasoned that the encounter occurred in a "high crime and drug" area, that the encounter occurred around midnight, that Officer Rudy "testified about his experience as part of the community problem response team, focusing on drug complaints," that Stocks turned into an alley and was " 'pretty close to running' upon seeing the cruiser," and that Stocks "put his hand into his right pocket when the cruiser became visible." We disagree with the trial court's assessment of the totality of the circumstances.

{¶ 19} It is undisputed that Officer Rudy was assigned to the neighborhood at issue, which was the subject to numerous drug-related complaints, and that the encounter with Stocks occurred around midnight on June 13, 2017. At that time, Rudy was on patrol; he was not responding to any specific complaint of criminal activity, nor did he observe any criminal activity. There was no evidence that Stocks was coming from the direction of a known drug house or drug sale location, or that any other suspicious individuals were nearby.

{¶ 20} Officer Rudy became suspicious of Stocks when Stocks turned abruptly down an alley and began to walk very rapidly. The officer indicated that Stocks turned when the cruiser "was clearly visible." Officer Rudy testified that he wanted to stop and talk to Stocks, because he believed that Stocks was trying to evade contact with the police; Officer Rudy turned his cruiser around. When Stocks was again walking toward the cruiser, Officer Rudy saw Stocks put his right hand in his pocket. (Stocks had cigarettes in his pocket.) This time, Stocks did not evade the cruiser, and Stocks can be seen on the cruiser video beginning to walk past it. Officer Rudy stopped and spoke with Stocks beside the right passenger door of the cruiser.

{¶ 21} On cross-examination, Officer Rudy agreed that he had a "hunch" that Stocks was trying to evade him when he saw Stocks walking quickly. On redirect examination, Rudy clarified that it was "not the typical response when someone sees a police cruiser to rapidly change directions and start walking quickly the other way." The officer continued that, based on his experience and training, "that sort of behavior indicates to me that he's either involved in some type of criminal activity at that point or he's got a warrant and he's trying to evade any contact with the police."

{¶ 22} Viewing the totality of the circumstances, we conclude that Stocks's actions caused Officer Rudy to have an "inchoate and unparticularized suspicion or 'hunch' " that Stocks was avoiding the police, *see Terry* at 27, but that Stocks's actions were insufficient to create a particularized suspicion that Stocks was engaged in criminal activity. While unprovoked flight from the police in an area known for heavy narcotics trafficking may be sufficient to justify a *Terry* stop, *see Wardlow*, 528 U.S. at 124, 120 S.Ct. 673, 145 L.Ed.2d 570, there was no evidence that Stocks was walking from a particular home or area (as

opposed to the neighborhood as a whole) that was known for drug activity. The officer was not responding to any particular complaint of criminal activity, nor did he observe any by Stocks. The only behavior by Stocks that raised the officer's suspicion was Stocks's change of the direction and speed in which he was walking. We conclude that the factual circumstances in this case, considered in their totality, do not rise to the level of reasonable articulable suspicion of criminal activity, and Stocks was not lawfully subject to an investigatory detention. Consequently, the trial court erred in failing to suppress the evidence resulting from that stop.

{¶ 23} Stocks's assignment of error is sustained.

### III. Conclusion

{¶ 24} The trial court's judgment will be reversed, and the matter will be remanded for further proceedings.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

TUCKER, J., dissents:

{¶ 25} I respectfully dissent based upon my conclusion that, when the totality of the circumstances are evaluated " 'through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold[,]' " Officer Rudy possessed a reasonable, articulable suspicion that Stocks was engaged in criminal conduct. *State v. Anderson*, 2018-Ohio-190, 104 N.E.3d 138, ¶ 11 (2d Dist.), quoting *State v. White*, 2d Dist. Montgomery No. 18731, 2002 WL 63294, *2, (Jan. 18, 2002), quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). Given this, the stop was

authorized by *Terry*, 391 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 26} The factors at play in the reasonable suspicion determination include the time of night (approximately midnight) at which the encounter occurred, the encounter occurred in a high drug and crime area, Stocks's abrupt change of direction and rapid walking when he initially observed Rudy's cruiser, and, after Rudy located Stocks after his abrupt change of direction, Stocks's placement of his right hand into his right pocket upon the cruiser's approach. A court, when evaluating the circumstances of a *Terry* stop, must "give due weight to [the involved officer's] experience and training and view the evidence as it would be understood by those in law enforcement." *Andrews at 88*, citing *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Rudy, at the time of the encounter with Stocks, was a 4-year veteran of the Dayton Police Department assigned to a Community Problem Response Team focusing on the "area around east (sic) 4th Street * * *." As such, Rudy was well aware that the neighborhood was "a high drug and crime area [with] a lot of problems with drugs * * *." An officer's late-night encounter with a citizen occurring in a high drug and crime area is, quite obviously, not sufficient to sanction a *Terry* stop. However, a high drug and crime area is "an articulable fact which is a part of the totality of circumstances surrounding a stop * * *." *Andrews* at 88, citing *State v. Bobo*, 37 Ohio St.3d 177, 179, 5245 N.E.2d 489 (1988). (Other citations omitted.) Also, the time of night at which the encounter occurred is a pertinent consideration in the totality of the circumstances mix. *Bobo* at 179; *State v. Taylor*, 10th Dist. Franklin No. 05AP-1016, 2006-Ohio-5866; *State v. Biehl*, 9th Dist. Summit No. 22054, 2004-Ohio-6532; *State v. Wood*, 2d Dist. Montgomery No. 19385, 2003-Ohio-3759. This consideration rests with the common sense notion that

criminal conduct is more likely afoot at such times.

{¶ 27} The Fourth Street area's crime and drug history and the late night time of the encounter must then be considered in conjunction with Stocks's abrupt change in direction and very quick walking and the placement of his right hand into his right pocket upon the cruiser's approach. The United States Supreme Court has recognized that "evasive behavior is a pertinent factor in determining reasonable suspicion." (Citations omitted.) *Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570. Such evasive behavior occurs on a continuum with "[h]eadlong flight --wherever it occurs -- [being] the consummate act of evasion. It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id. See also State v. Mayor*, 10th Dist. Franklin No. 09AP-434, 2009-Ohio-6777; *State v. Sellars*, 2d Dist. Montgomery No. 26121, 2014-Ohio-5366. In this case, Stocks's abrupt change of direction after which he quickly ("pretty close to running") walked away from Rudy's cruiser, though not headlong flight, is, when viewed through the eye of an experienced and reasonable police officer, certainly suggestive of criminal behavior.

{¶ 28} Turning to Stocks's placement of his right hand into his pocket, Rudy testified that "[W]henever somebody reaches into [his] pockets, especially when he sees a police officer, it creates an officer safety concern that [he] could be reaching for a weapon." We have recognized this safety concern as legitimate. *State v. Wilcox*, 2d Dist. Montgomery No. 18908, 2002-Ohio-276, ¶ 8; *State v. Montgomery*, 2d Dist. Montgomery No. 15232, 1996 WL 283943 (May 31, 1996). The concern created by a person reaching into a pocket, though often discussed within the context of whether a pat down search is appropriate, is also a circumstance relevant to whether the stop itself is a

reasonable Fourth Amendment intrusion. *Montgomery*; *State v. Daniel*, 81 Ohio App.3d 325, 610 N.E.2d 1099 (9th Dist.1992).

{¶ 29} In *Montgomery* we were confronted with facts quite similar to the facts in this case, but concluded that the stop was appropriate under *Terry*. The officer, as here, was patrolling a high drug activity area at night (approximately 11 p.m.). When Montgomery saw an approaching cruiser, "he quickly turned around and started walking at an angle up into the front yard of an apartment * * *." *Montgomery* at *1. The officer, in response to Montgomery's conduct, "rolled down the [cruiser's] passenger window, and asked Montgomery to step back to the cruiser [because] he wanted to get [Montgomery's] name and check him out a second." *Id.* The officer, based upon his experience with weapons in the area, asked Montgomery to remove his hand from his pocket. Montgomery did not immediately comply, prompting the officer to shine the cruiser's spotlight on Montgomery while ordering him to remove his hand from his pocket. Under these facts, we concluded that a stop occurred, as opposed to a consensual encounter, when the officer shined a spotlight on Montgomery and ordered him to remove his hand from his pocket. We further concluded as follows:

> [B]ased on the applicable standards, and giving weight to the [officer's] experience and training, * * * [the officer] had a reasonable suspicion that Montgomery was engaged in criminal conduct when [the officer] ordered Montgomery to take his hand out of his pocket. First, it was late at night and [the officer] was in a high crime area. Second, the officer had several years experience in that particular area and was aware that weapons were not uncommon. Added to these facts is Montgomery's evasive act of

changing direction and quickly walking away when he saw the cruiser. *Id.* at *3. I find it difficult to reconcile our conclusion in *Montgomery* with the majority's conclusion in this case. Though perhaps one can quibble with a detail or two, each case involves a late night encounter in a high drug area, an individual who changed directions and quickly walked away upon seeing a police cruiser, and, when the officer initiated contact, the individual had his hand in a pocket. Consistent with *Montgomery*, I conclude that when the stop occurred, viewing the facts from the perspective of a reasonable and prudent police officer, Rudy had a reasonable, articulable suspicion that Stocks was engaged in criminal conduct. Accordingly, I would affirm the trial court's judgment.

Copies sent to:

Mathias H. Heck
Michael P. Allen
Susan F. Souther
Jacob S. Seidl
Hon. E. Gerald Parker, Jr.