[Cite as *State v. Allen*, 2021-Ohio-3047.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28874 |
| | : | |
| v. | : | Trial Court Case Nos. 2018-CR-3653 |
| | : | & 2019-CR-229 |
| MICHAEL RAYSHAWN ALLEN | : | |
| | : | (Criminal Appeal from |
| Defendant-Appellant | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 3rd day of September, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

J. DAVID TURNER, Atty. Reg. No. 0017456, 101 Southmoor Circle NW, Dayton, Ohio 45429
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} Michael Rayshawn Allen was convicted after separate jury trials of carrying a concealed weapon in Montgomery C.P. No. 2018-CR-3653 and improper handling of a firearm in a motor vehicle in Montgomery C.P. No. 2019-CR-229.   In each case, the trial court had overruled Allen's pretrial motion to suppress evidence, which claimed that police officers lacked a reasonable articulable suspicion to stop him.   Allen appeals from his convictions, challenging the trial court's denials of his motions to suppress.   For the following reasons, the trial court's judgments will be affirmed.

## I. Facts and Procedural History

{¶ 2} At the suppression hearing, the State presented the testimony of three Dayton police officers who were involved in the incidents: Scott Myers and Brian Rolfes in Case No. 2018-CR-3653 and Vincent Carter in Case No. 2019-CR-229.   The State also offered the cruiser camera videos of both events.   Allen testified on his own behalf. The evidence at the suppression hearing revealed the following facts.

### A. Case No. 2018-CR-3653: Carrying a Concealed Weapon

{¶ 3} At approximately 11:15 p.m. on September 18, 2018, Officers Myers and Rolfes were patrolling the area around the Shell gas station at the southwest corner of Free Pike and North Gettysburg Avenue in Dayton.   The police had received complaints from and requests for increased patrols of the gas station due to loitering, trespassing, and drug activity at the gas station.   Officer Rolfes described the gas station as a high drug and crime area, and Allen agreed.

{¶ 4} After driving around the area, the officers paused in the Veterans of Foreign Wars (VFW) lot to the west of the Shell station.   While the officers watched from their

cruiser, they observed Allen walk from the gas station across Free Pike, not using a crosswalk located nearby. Officer Myers did not see anything suspicious about Allen, except the jaywalking. Allen admitted at the suppression hearing that he had jaywalked. He stated that he lived across the street from the gas station and that walking straight across Free Pike was a more direct route.

{¶ 5} Officer Rolfes, who was driving, activated the cruiser's overhead lights and pulled up beside Allen, who was then walking on the sidewalk on the north side of Free Pike. Both officers exited the cruiser and approached Allen. Allen had already taken out his identification. Officer Myers obtained Allen's identification and returned to the cruiser to run the information through the on-board computer while Officer Rolfes remained with Allen. Rolfes admonished Allen to use the crosswalk, saying he did not want Allen to be hit by traffic. Allen and Officer Rolfes chatted while they waited.

{¶ 6} According to Myers, the computer search revealed that Allen had been arrested for carrying a concealed weapon. Officer Myers exited the cruiser and walked up to Allen. The cruiser video reflects that Myers asked Allen, "Hey, you don't mind if I pat you down for weapons, do you?" (State's Ex. 1, 23:14:07.) Allen responded, "Aw, no." Myers testified that he felt a "large solid object" in Allen's right short's pocket. He did not know what it was, but suspected that it possibly could be a weapon. Allen stated to the officers that he had a license to concealed carry. (*Id.,* 23:14:09-15.)

{¶ 7} Myers reached into Allen's pocket and removed a black SCCY 9mm handgun. Officer Rolfes explained to Allen that he had needed to inform the officers immediately that he was carrying a firearm. Allen and the officers then discussed the need for Allen to obtain a license before he could carry a concealed weapon, as opposed

to openly carrying a weapon.   Allen stated that he had taken a concealed carry class but had not applied for a license because the class did not inform him that he needed to apply for a permit.   Allen acknowledged at the suppression hearing that he did not have a concealed carry license.

{¶ 8} Officer Myers checked to see if the gun was loaded, and found that it was. He then asked the dispatcher to check for prior weapons convictions.   Soon after, the dispatcher informed Officer Myers that Allen "didn't really have anything."   (State's Ex. 1, 23:19:30.)   She indicated that he had been arrested for a few felonies but did not have any convictions.   (State's Ex. 1, 23:19:29.)   Officer Myers asked the dispatcher to check on the SCCY firearm that he had recovered from Allen.

{¶ 9} At the suppression hearing, Myers testified that he performed the pat down due to Allen's arrest record and the facts that the area was known for drugs and people who carry drugs are known to carry weapons.   Myers identified the high-crime area as "the entire west side."   In contrast, Officer Rolfes testified that Allen consented to the search of his person.

{¶ 10} Allen provided a different version as to how the weapon was found.   He testified that he did not realize when the stop began that he was carrying his gun.   While speaking with Officer Rolfes, he repeatedly heard the dispatcher say, "Let him go."   Allen asked to leave and requested the return of his identification.   Allen testified that, instead of letting him leave, the officer said, "F*ck that.   What you got in your pockets?" and then "smacked" his pocket.   The cruiser video belies Allen's version of events.

{¶ 11} At the hearing, Allen denied that he consented to the search.   He testified that he had a gun for his family's protection.

{¶ 12} In November 2018, Allen was indicted for carrying a concealed weapon, and a warrant was issued for his arrest. The warrant was not immediately served.

**B. Case No. 2019-CR-229: Improper Handling of a Firearm**

{¶ 13} At approximately 12:30 a.m. on January 19, 2019, Dayton Police Officers Vincent Carter and Cody Hartings were patrolling North Gettysburg Avenue, an area known for high drug activity and gun violence. Their cruiser and a second cruiser were stopped in the parking lot of a Dollar General store at the intersection with Queens Avenue, where they could easily watch northbound and southbound traffic. According to Officer Carter, the officers saw a Mercedes approach Gettysburg eastbound on Queens, "pull out onto Gettysburg to head northbound," and then quickly put the car in reverse and drive in reverse back down Queens Avenue. Officer Carter testified that improperly backing in a street is a traffic violation.

{¶ 14} Officer Hartings, who was driving, pulled the cruiser onto Gettysburg and headed toward Queens. Carter testified that the officers could see the Mercedes on Queens do a three-point turn to face westbound and then park along the curb. The officers believed that the vehicle's driver had seen the cruisers and changed direction to avoid detection by the police, a practice that Carter stated was common, "especially on Gettysburg." Officer Carter referred to the maneuver as the "Gettysburg Flip." The officers pulled up behind the parked Mercedes. The cruiser video showed that the cruiser's overhead lights were not activated.

{¶ 15} The officers approached the Mercedes and found two occupants: Allen, the driver, and a female passenger. As Officer Hartings spoke with Allen, Officer Carter looked in the vehicle's windows using his flashlight and saw a black handgun, a Taurus

9mm, on the rear floorboard. Carter advised Hartings to get Allen out of the car. Allen complied and, after a few moments, was taken to the cruiser. Officer Carter then had the passenger exit the car. At this juncture, another cruiser arrived and parked a short distance in front of Allen's vehicle.

{¶ 16} The officers requested an evidence technician to retrieve the gun. Upon searching the vehicle, no drugs or other unlawful items were found.

{¶ 17} The officers learned that Allen had a warrant for his arrest on a carrying a concealed weapon charge. Officer Hartings informed Allen of his *Miranda* rights, and Allen said that he wanted to talk. Allen admitted the gun was his and stated that he had purchased it from a pawn shop. He expressed that he was lawfully carrying the weapon because it was out in the open and not concealed.

{¶ 18} Testifying on his own behalf, Allen stated that he and his companion were "just sitting" in his parked car when the police cruiser "rolled past" his car. Allen stated that the officers looked in the front windshield, looked at Allen and his friend, and then turned on the cruiser's overhead lights. When asked if his car "ever back[ed] up in any way," Allen responded, "No, I wasn't doing anything. I was just sitting there." Allen acknowledged that he had a gun on the rear floorboard that was readily visible.

{¶ 19} In March 2019, Allen was indicted for improper handling of a firearm in a motor vehicle (loaded/no license). Allen acknowledged that he had received a traffic citation and appeared in municipal court related to this incident, although it is not clear whether the citation was for improper backing.

### C. Procedural History

{¶ 20} Allen sought to suppress the evidence against him, including all physical

evidence and any statements that he made in both cases. Allen claimed that the officers lacked a reasonable, articulable suspicion to stop and detain him, and that his statements were made involuntarily and contrary to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 15 L.Ed.2d 694 (1966).

{¶ 21} The trial court held a joint hearing on the motions on June 28, 2019. A week later, the trial court denied the motions. Allen proceeded to separate jury trials in his two cases, following which he was found guilty of the charged offenses. In each case, the court sentenced him to up to five years of community control.

{¶ 22} Allen appeals from his convictions. In his first assignment of error, Allen claims that the pat down in Case No. 2018-CR-3653 was unlawful and, therefore, the trial court erred in denying his motion to suppress. In his second assignment of error, Allen claims that the trial court erred in denying his motion to suppress in Case No. 2019-CR-229, because the officers did not have probable cause to conduct a traffic stop of his vehicle.

## II. Standard for Review for a Motion to Suppress

{¶ 23} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable

legal standard." *Id.*

**{¶ 24}** In this case, the trial court's rulings denying the motions to suppress did not make any specific factual findings. Rather, the trial court stated: "Upon review of the testimony presented, including that of the Defendant, and State's Exhibit [1 and 2] (Cruiser Camera), this Court DENIES Defendant's Motion to Suppress."

**{¶ 25}** Crim.R. 12(F) provides, in part, that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." "Crim.R. 12(F) mandates that a trial court state its essential findings on the record when factual issues are involved in determining a motion to suppress." *State v. Brown*, 2d Dist. Montgomery No. 24297, 2012-Ohio-195, ¶ 10.

**{¶ 26}** Crim.R. 12(F) is not self-executing, however – a defendant must specifically request findings of fact. *State v. Adams*, 146 Ohio St.3d 232, 2016-Ohio-3043, 54 N.E.3d 1227, ¶ 16. *See, e.g., Brown* at ¶ 10, citing *State v. Benner*, 40 Ohio St.3d 301, 317, 533 N.E.2d 701 (1988). "While it is error for the trial court to fail in providing requested findings of fact, [it] is not prejudicial where the record provides an appellate court with a sufficient basis to review the assignments of error." *Brown* at ¶ 10. If, however, the record, standing alone, is insufficient to allow a full review of a defendant's claims on appeal regarding his motion to suppress, we must reverse and remand to the trial court to make findings of fact and conclusions of law based on the evidence adduced at the suppression hearing. *Id.* at ¶ 12.

**{¶ 27}** It is unclear why the trial court did not provide findings of fact, particularly given that Myers's and Rolfes's testimonies were not entirely consistent and Allen's testimony differed from the testimonies of the officers. Moreover, although the State

submitted the cruiser camera videos for the trial court's review, the pat down during the 2018 stop occurred off-camera, and the video of the January 2019 stop began after the officers approached the vehicle.

{¶ 28} Despite these deficiencies, the videos portray most of what occurred, and the parties' interpretation of the relevant events, as stated in their appellate briefs, is generally consistent. Upon review of the suppression hearing evidence, and considering the specific issues raised in this appeal, we conclude that the record provides a sufficient basis to review the trial court's suppression rulings.

### III. Relevant Legal Standards

{¶ 29} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Whether a stop and/or search is reasonable under the Fourth Amendment depends upon the particular facts and circumstances, viewed objectively by examining the totality of the circumstances. *See State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, 47 N.E.3d 821, ¶ 14.

{¶ 30} The law recognizes three types of police-citizen interactions: 1) a consensual encounter, 2) a brief investigatory stop or detention, and 3) an arrest. *State v. Weisgarber*, 2017-Ohio-8764, 88 N.E.3d 1037, ¶ 15 (2d Dist.), citing *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 20 (2d Dist.). In determining whether an individual engaged in a consensual encounter or was subject to an investigatory detention, the focus is on the police officer's conduct, not the subjective state of mind of the person

stopped. *Weisgarber* at ¶ 18; *State v. Ramey*, 2d Dist. Montgomery No. 26705, 2016-Ohio-607, ¶ 25.

{¶ 31} Consensual encounters are not seizures, and the Fourth Amendment guarantees are not implicated in such an encounter. *State v. Taylor*, 106 Ohio App.3d 741, 747-749, 667 N.E.2d 60 (2d Dist.1995), citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Consensual encounters occur when the police merely approach a person in a public place and engage the person in conversation, and the person remains free not to answer and to walk away. *State v. Lewis*, 2d Dist. Montgomery No. 22726, 2009-Ohio-158, ¶ 21, citing Mendenhall at 553. " 'Generally, when a police officer merely approaches and questions persons seated within parked vehicles, a consensual encounter occurs that does not constitute a seizure so as to require reasonable suspicion supported by specific and articulable facts.' " *State v. Mayberry*, 2d Dist. Montgomery No. 23736, 2010-Ohio-4150, ¶ 25, quoting *State v. Jones*, 188 Ohio App.3d 628, 2010-Ohio-2854, 936 N.E.2d 529, ¶ 20.

{¶ 32} As to investigatory detentions, police officers may briefly stop and/or temporarily detain individuals to investigate possible criminal activity if the officers have a reasonable, articulable suspicion that criminal activity may be afoot, including a minor traffic violation. *Terry*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *State v. Mays*, 119 Ohio St.3d 406, 2008-Ohio-4539, 894 N.E.2d 1204, ¶ 7-8. Probable cause is not required. *Id.*; *State v. Tidwell*, Ohio Slip Opinion No. 2021-Ohio-2072, __ N.E.3d. __; *Kansas v. Glover*, __ U.S. __, 140 S.Ct. 1183, 1187, 206 L.Ed.2d 412 (2020). As stated in *Mays*:

Probable cause is certainly a complete justification for a traffic stop, but we

have not held that probable cause is required. Probable cause is a stricter standard than reasonable and articulable suspicion. The former subsumes the latter. Just as a fact proven beyond a reasonable doubt has by necessity been proven by a preponderance, an officer who has probable cause necessarily has a reasonable and articulable suspicion, which is all the officer needs to justify a stop.

(Citation omitted.) *Mays* at ¶ 23.

{¶ 33} We determine the existence of reasonable suspicion by evaluating the totality of the circumstances, considering those circumstances "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Heard*, 2d Dist. Montgomery No. 19323, 2003-Ohio-1047, ¶ 14, quoting *State v. Andrews*, 57 Ohio St.3d 86, 87-88, 565 N.E.2d 1271 (1991). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." (Citation omitted.) *Glover* at 1187.

{¶ 34} "The authority to stop an individual does not necessarily equate to authority to search the individual." (Citations omitted.) *State v. Lovins*, 2d Dist. Montgomery No. 23530, 2010-Ohio-3916, ¶ 12. Once a lawful investigatory or traffic stop has been made, a police officer may conduct a limited protective search for concealed weapons only if the officer reasonably believes that the suspect may be armed or a danger to the officer or to others. *State v. Evans*, 67 Ohio St.3d 405, 408, 618 N.E.2d 162 (1993); *State v. Klase*, 2019-Ohio-3392, 131 N.E.3d 1054, ¶ 24, (2d Dist.) quoting *State v. Todd*, 2d Dist. Montgomery No. 23921, 2011-Ohio-1740, ¶ 29.

{¶ 35} "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence * * *." *Evans* at 408, quoting *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). "In other words, 'the protective pat down under *Terry* is limited in scope to its protective purpose and cannot be employed by the searching officer to search for evidence of crime.' " *State v. Millerton*, 2015-Ohio-34, 26 N.E.3d 317, ¶ 26 (2d Dist.), quoting *State v. Holley*, 2d Dist. Montgomery No. 20371, 2004-Ohio-4264, ¶ 10.

{¶ 36} To justify a pat-down search, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868, 20 L.Ed.2d 889. "The officer need not be absolutely certain that the individual is armed; rather, the issue is whether a reasonably prudent man in those circumstances would be warranted in the belief that his safety or the safety of others was in danger." *State v. Grefer*, 2d Dist. Montgomery No. 25501, 2014-Ohio-51, ¶ 24, citing *State v. Andrews*, 57 Ohio St.3d 86, 89, 565 N.E.2d 1271 (1991). The totality of the circumstances must "be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *Id.* at 87-88.

{¶ 37} We have repeatedly held that mere presence in a high-crime or high-drug area, by itself, is insufficient to justify the stop and frisk of a person, especially when the officer indicated that the offender did nothing to make the officer worry that the offender would harm him. *E.g., State v. Taylor*, 2d Dist. Montgomery No. 25169, 2013-Ohio-814, ¶ 22 ("[a] suspect's location in a high crime area alone will not justify a weapons frisk"); *Millerton* at ¶ 32; *State v. Habel*, 190 Ohio App.3d 393, 2010-Ohio-3907, 942 N.E.2d 389,

¶ 24 (2d Dist.), citing *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300,

¶ 18.  Rather, the officer must have an individualized suspicion that the suspect is armed

and dangerous. *Taylor* at ¶ 22.

### IV. Review of the Motion to Suppress Rulings

#### A. Case No. 2018-CR-3653

**{¶ 38}** Allen was stopped by Officers Myers and Rolfes after the officers observed his crossing Free Pike from the Shell gas station without using the nearby crosswalk. Allen admitted at the suppression hearing that he had jaywalked.  The officers' observation of the jaywalking provided reasonable and articulable suspicion that Allen had engaged in criminal activity, albeit a minor misdemeanor.  Accordingly, the officers' stop of Allen was lawful.

**{¶ 39}** Allen argues that there was no evidence to justify a pat down.  He emphasizes that there was nothing suspicious about his appearance or actions; he was compliant, had no bulging pockets, made no assertive movements, was not belligerent or verbally abusive, and had not discarded anything.  Allen noted that he produced his identification and provided it to the officers before they requested it.

**{¶ 40}** Officer Myers testified that he ran Allen's identification through the cruiser's on-board computer and learned that Allen had a prior arrest for carrying a concealed weapon.  The officers and Allen all agreed that the area where the stop occurred was a high-crime and high-drug activity area, and the officers indicated that the owner of the Shell gas station had requested patrols due to loitering, trespassing, and drug activity in the lot.

**{¶ 41}** The officers' testimony and the cruiser video supported Allen's assertion

that he did not engage in suspicious behavior. Allen was cooperative with the officers, and he and Officer Rolfes engaged in friendly conversation while Officer Myers ran Allen's identification. Nevertheless, while Allen's presence in a high-crime and high-drug activity area did not, alone, provide a sufficient basis for Officer Myers to perform a pat down for weapons, the information that Allen had previously been arrested for carrying a concealed weapon created a reasonable individualized suspicion that Allen may be armed and dangerous. *Contrast, e.g., State v. Ewing*, 2017-Ohio-7194, 95 N.E.3d 1112 (after lawful stop for jaywalking, officers lacked a reasonable articulable suspicion that defendant may have been armed, based solely on area being a high drug and prostitution area). Officer Myers conceded on cross-examination that the weapons arrest was several years old. Nevertheless, we cannot conclude that the officer acted unreasonably when he patted down Allen for his and Officer Rolfes's safety.

{¶ 42} Allen's first assignment of error is overruled.

**B. Case No. 2019-CR-229**

{¶ 43} In this case, Officer Carter and his partner were seated in their cruiser in the parking lot of a store located at the intersection of North Gettysburg Avenue and Queens Avenue. According to Officer Carter, he observed a Mercedes approach the intersection on Queens, begin to enter the intersection, and then drive back down Queens in reverse. Allen was found to be driving the Mercedes. As the officers drove toward Allen's vehicle, Allen did a three-point turn and parked at the curb. The parties agree that the Mercedes was parked along the curb when the officers arrived. After approaching the vehicle, Officer Carter saw a weapon in the vehicle in plain view.

{¶ 44} On appeal, Allen claims that Officer Carter's testimony "did not provide

sufficient evidence that [Allen] committed the traffic offense of improper backing, in violation of R.C. 4511.38. In addition, Officer Carter's testimony was inconclusive that [Allen] was the person who committed the alleged offense." Allen noted that the cruiser video of the incident did not show the traffic offense or the stop, as the video began while the officers were standing outside Allen's vehicle. Allen does not challenge Officer Carter's testimony that he (the officer) saw the firearm in plain view while looking through the window of Allen's stopped vehicle.

{¶ 45} R.C. 4511.38, entitled "Care to be exercised in starting or backing vehicles," provides, in relevant part:

(A) No person shall start a vehicle * * * which is stopped, standing, or parked until such movement can be made with reasonable safety.

Before backing, operators of vehicles * * * shall give ample warning, and while backing they shall exercise vigilance not to injure person or property on the street or highway.

No person shall back a motor vehicle on a freeway, except: in a rest area; in the performance of public works or official duties; as a result of an emergency caused by an accident or breakdown of a motor vehicle.

R.C. 4511.38(A); *see also* Dayton Municipal Code 71.01, which is nearly identical. A "freeway" is a "divided multi-lane highway for through traffic with all crossroads separated in grade and with full control of access." R.C. 4511.01(YY).

{¶ 46} Based on the trial court's ruling, the court implicitly credited Officer Carter's testimony that he observed the driver of the Mercedes approach Gettysburg Avenue and begin to enter the intersection, "thr[o]w the vehicle in reverse" and reverse back down

Queens Avenue. Officer Carter further testified that the driver's conduct constituted a traffic violation, but we need not credit that legal conclusion.

{¶ 47} We agree with Allen that driving quickly in reverse down a residential street, without more, does not violate R.C. 4511.38(A), and the State did not provide any additional information to support Officer Carter's belief that Allen, the driver of the vehicle, had violated that statute. The cruiser video did not capture the alleged traffic violation; the video began with the officers' approaching the parked Mercedes. The video showed Allen's vehicle parked on a residential street with virtually no vehicular traffic. During the encounter, only one additional vehicle drove by, other than police cruisers and a tow truck for Allen's automobile. There was no evidence that Allen provided inadequate warning to other drivers or that his backing caused damage or injury to any person or property. With the evidence before us, the officers lacked a reasonable and articulable suspicion that Allen violated R.C. 4511.38(A) or the analogous Dayton Municipal Code ordinance.

{¶ 48} Officer Carter further testified that the officers believed that the driver of the Mercedes had seen the cruisers and changed direction to evade the police. While Allen's driving may have caused the officers to have an "inchoate and unparticularized suspicion or 'hunch' " that he was avoiding the police, *see Terry,* 392 U.S. at 27, 88 S.Ct. 1868, 20 L.Ed.2d 889, his actions were insufficient to create a particularized suspicion that he was engaged in criminal activity. *Accord State v. Stocks*, 2d Dist. Montgomery No. 28191, 2019-Ohio-2944.

{¶ 49} Nevertheless, based on the video, we conclude that the officers' initial approach constituted a consensual encounter, not an investigatory detention. The officers' cruiser stopped to the rear of Allen's vehicle, and the video reflects that the

cruiser's overhead lights were not activated. No other vehicles were in front of the Mercedes, and Allen could have driven away without difficulty or obstruction. Although the cruiser video did not include audio until after Allen was taken to the cruiser, the video substantiated Officer Carter's testimony that he looked through the Mercedes's windows with his flashlight while Officer Hartings spoke with Allen, who was then seated in the driver's seat. At that time, Carter saw the gun in plain view, a fact that Allen does not dispute.

{¶ 50} Accordingly, we conclude that the officers lawfully approached Allen's parked vehicle and saw through the car window, in plain view, a firearm on the rear floorboard. The trial court thus properly denied Allen's motion to suppress.

{¶ 51} Allen's second assignment of error is overruled.

### V. Conclusion

{¶ 52} The trial court's judgments will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, J. concurs with the majority in Case No. 2019-CR-229 and concurs separately in Case No. 2018-CR-3653:

{¶ 53} I agree with the majority's analysis in Case No. 2019-CR-229. I write separately only to address my rationale for concurring in Case No. 2018-CR-3653, a different reason than adopted by the majority. Since the trial court did not make written or oral findings of fact and conclusions of law, it is not clear if the trial court overruled the

motion to suppress after a jaywalking infraction was established because Allen consented to the pat down for weapons and/or because the court was satisfied that a prior carrying a concealed weapon arrest (not conviction) took the case outside our prior holdings in *Taylor* and *Ewing.* Unquestionably, Allen was cooperative, provided identification, did not engage in any suspicious behavior, and did not exhibit any furtive gestures. A minor misdemeanor jaywalking citation under Title 45, the traffic code, not Title 29, the criminal code, could have readily been issued for jaywalking. Jaywalking is not a crime but rather an infraction carrying no jail time and, in fact, the record herein demonstrates that Allen was not subject to arrest for jaywalking. State's Exhibit 1, the cruiser cam video reviewed by the trial court before rendering its decision, supported this analysis of the stop.

{¶ 54} Allen's conduct that evening, albeit in a high crime area, did not provide the officers with the requisite concern for officer safety that the Fourth Amendment requires. It was Allen's conduct that night which should be the linchpin of the Fourth Amendment analysis, not his singular arrest several years earlier. I recognize the legitimacy of concerns for officers' safety, yet we should not overlook the fact that a patdown "is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and is not to be undertaken lightly." *Terry v. Ohio,* 302 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

{¶ 55} Nevertheless I concur in the judgment affirming a denial of the motion to suppress, because the cruiser cam video indisputably established that Allen consented to the pat down as testified to by Officer Myers.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
J. David Turner
Hon. Gerald Parker