OPINION
{¶ 1} State of Ohio, plaintiff-appellant, appeals from a judgment of the Franklin County Court of Common Pleas, in which the court granted the motion to suppress evidence filed by Donald C. Taylor, defendant-appellee.
 {¶ 2} On November 27, 2004, police received a call from a United Dairy Farmers ("UDF") convenience store clerk, who reported that she had overheard a man call someone to pick him up and to bring a gun. Three officers sitting in a parking lot across the street from the UDF store received a computerized dispatch from the central dispatcher, who indicated that a man was overheard requesting that someone pick him up and bring a gun, and that the man was a white male with short brown hair wearing a white t-shirt and jeans. One of the three officers later testified the dispatch also indicated the man was "upset" and "frantic." The officers almost immediately observed a man exit the UDF store matching the description. A vehicle pulled into the parking lot, and the man stepped into the passenger's side of the vehicle. As the vehicle was preparing to leave, the police stopped it. The passenger, Robert O'Connor, was taken from the car and patted down. Although no weapons were found on him, O'Connor had scraped knuckles and told officers he had been in a fight at Bitola's Bar, which was across the street from the UDF store. The officers asked the driver, appellee, to exit the vehicle and asked him whether he had anything on him. Appellee motioned to his pocket, where a firearm was found. The officers arrested appellee.
 {¶ 3} Appellee was indicted on one count of carrying a concealed weapon and one count of improper handling of a firearm in a motor vehicle. Appellee filed a motion to suppress evidence of the handgun, arguing that the investigative stop was illegal. On September 12, 2005, a hearing was held on appellee's motion to suppress, at which the three officers involved in appellee's arrest testified. On September 19, 2005, the trial court issued a decision and entry granting appellee's motion to suppress. The state appeals the judgment of the trial court, asserting the following assignment of error:
THE TRIAL COURT ERRED WHEN IT GRANTED DEFENDANT'S MOTION TO SUPPRESS.
 {¶ 4} The state argues in its assignment of error that the trial court erred in granting appellee's motion to suppress. The standard of review with respect to a motion to suppress is limited to determining whether the trial court's findings are supported by competent, credible evidence. State v. Lattimore,
Franklin App. No. 03AP-467, 2003-Ohio-6829, at ¶ 5. In a hearing on a motion to suppress, the trial court assumes the role of trier of fact, and, because the court is in the best position to resolve questions of fact and evaluate the credibility of witnesses, a reviewing court "must accept the trial court's factual findings and the trial court's assessment of witness credibility." Id. However, while "[a]ccepting those facts as true, an appellate court must independently determine, as a matter of law, without deference to the trial court's conclusion, whether the facts meet the applicable legal standard." Id.
 {¶ 5} The Fourth Amendment to the United States Constitution prohibits warrantless searches and seizures, rendering them, per se, unreasonable unless an exception applies. Katz v.United States (1967), 389 U.S. 347, 88 S.Ct. 507. A police stop of a motor vehicle is a significant intrusion requiring justification as a "seizure" within the meaning of the Fourth Amendment.Delaware v. Prouse (1979), 440 U.S. 648, 99 S.Ct. 1391. The investigative stop exception to the Fourth Amendment warrant requirement permits a police officer to stop an individual, provided the officer has the requisite reasonable suspicion based upon specific, articulable facts that a crime has occurred or is imminent. Terry v. Ohio (1968), 392 U.S. 1, 21. In evaluating the propriety of an investigative stop, the reviewing court must examine the totality of the circumstances surrounding the stop as "viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold."State v. Andrews (1991), 57 Ohio St.3d 86, 87-88.
 {¶ 6} Further, the Ohio Supreme Court has identified several factors that can be considered in determining the reasonableness of an investigatory search and seizure: (1) location, which may include whether the area was a "high-crime" area or under police surveillance; (2) the officer's experience, training, or knowledge, including particular knowledge of crimes in the area; (3) the suspect's conduct or appearance, including suspicious movements, hiding, or ducking; and (4) the surrounding circumstances, which may include time of day or night and whether the officer was away from protection or without backup. State v.Bobo (1988), 37 Ohio St.3d 177, 178-179; Andrews, supra, at 87-88. No single factor is dispositive, as the decision must be viewed based on the totality of the circumstances. Bobo, at paragraph one of the syllabus.
 {¶ 7} Here, the trial court found that the police lacked a reasonable suspicion to stop appellee's vehicle. A police officer need not always have knowledge of the specific facts justifying a stop and may rely upon a dispatch. Maumee v. Weisner (1999),87 Ohio St.3d 295, 297. The admissibility of evidence uncovered during a stop does not rest upon whether the officers relying upon a dispatch were themselves aware of the specific facts that led the colleagues to seek their assistance, but turns instead upon whether the officer who issued the dispatch possessed a reasonable suspicion to make a stop. Id., citing United Statesv. Hensley (1985), 469 U.S. 221, 231, 105 S.Ct. 675. Thus, if the dispatch has been issued in the absence of a reasonable suspicion, then a stop in objective reliance upon it violates theFourth Amendment. Id. The state must therefore demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity. Id., at 298.
 {¶ 8} When the information possessed by the police before the stop was solely from an informant's tip, the determination of reasonable suspicion will be limited to an examination of the weight to be given the tip and the reliability of the tip. Id., at 299. The Ohio Supreme Court has recognized three general classes of informants: the anonymous informant, the known informant from the criminal world who has provided previous reliable tips, and the identified citizen informant. Id., at 300. In the present case, we agree with the trial court that the information came to the dispatcher via an identified citizen informant. Courts have been lenient in their assessment of the type and amount of information needed to identify a particular informant. Id., at 301. Here, the three officers testified that they knew the information came into the dispatcher from a UDF clerk. The officers were familiar with many of the clerks at this particular UDF store because the clerks frequently contacted the police about suspicious activity in and around the UDF store. SeeNewcomerstown v. Ungurean (2001), 146 Ohio App.3d 409, 412
(finding informant was "identified," in part, because the police department was familiar with the informant's place of employment, having received prior complaints from the truck stop). The UDF clerk who made the call was also readily identifiable by location, occupation, employer, and phone number, though the officers did not know the clerk's name prior to the stop. See id. (informant was identifiable, in part, because the C.A.D. incident report included the address of the truck stop where the caller was employed); State v. Totarella, Lake App. No. 2002-L-147,2004-Ohio-1175, at ¶ 25 (although no name was given, a "neighbor" who gave address of criminal activity was an identifiable informant); Columbus v. Wright, Franklin App. No. 03AP-421,2004-Ohio-188, at ¶ 14 (although no name was given, informant gave address and was identifiable); State v. Jordan (Oct. 19, 2001), Montgomery App. No. 18600 (whether an informant is "anonymous" depends on whether the informant himself took steps to maintain anonymity, not on whether the police had time to get his name). Thus, we find the UDF clerk was an identified citizen informant.
 {¶ 9} We must next determine from the totality of the circumstances whether the UDF clerk's tip was reliable, weighing in favor of the informant's reliability and veracity. The Ohio Supreme Court has made it clear that an identified, and unquestionably honest citizen informant who comes forward with a report of criminal activity, "`which if fabricated would subject him to criminal liability,'" is considered presumptively reliable and thus a strong showing of other indicia of reliability is, therefore, unnecessary. Weisner, supra, at 300, quotingIllinois v. Gates (1983), 462 U.S. 213, 233-234,103 S.Ct. 2317. In the present case, we find the clerk's tip had indicia of reliability. The clerk was identified by employer, occupation, and address and provided an eyewitness account of the activities in question, along with specific details of O'Connor's appearance. See State v. Shepler, Licking App. No. 2005CA00033,2005-Ohio-5212, at ¶ 21 (tip from identified citizen informant was reliable because he provided his address, his employer, and relevant phone numbers). The UDF clerk was also prompt in providing the information to authorities. "This immediacy lends further credibility to the accuracy of the facts being relayed, as it avoids reliance upon the informant's memory." Weisner,
supra, at 302. Thus, we find the UDF clerk was an identified citizen informant with firsthand knowledge of the events, thereby rendering her tip reliable. See Shepler, at ¶ 21 (tipster was reliable because he provided a firsthand eyewitness account of the crime with specific details).
 {¶ 10} The final issue is whether the tip itself was sufficient to justify a reasonable suspicion of criminal activity, allowing the officers to stop appellee in reliance on the dispatch. After a review of all the evidence surrounding the circumstances with which the officers were presented prior to the stop, we find reasonable suspicion existed sufficient to justify the stop.
 {¶ 11} Although neither O'Connor's nor appellee's activities leading up to the arrest were illegal, reasonable suspicion may be based upon activity that is not illegal. See, e.g., State v.Wortham (2001), 145 Ohio App.3d 126, 129. Similarly, although each of the acts, in and of itself, could perhaps appear innocent, police officers may still have justification for conducting further investigation when the acts are viewed together. See United States v. Sokolow (1989), 490 U.S. 1, 9,109 S.Ct. 1581. "Even in Terry, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation[; however,] * * * Terry recognized that the officers could detain the individuals to resolve the ambiguity." Illinois v. Wardlow
(2000), 528 U.S. 119, 125, 120 S.Ct. 673. The Supreme Court'sFourth Amendment jurisprudence following Terry requires only that an investigatory stop be "justified by some objective manifestation that the person stopped is, or is about to be,
engaged in criminal activity." (Emphasis added.) United Statesv. Cortez (1981), 449 U.S. 411, 417, 101 S.Ct. 690.
 {¶ 12} In the present case, the record reveals that, when the officers were first alerted via the computer dispatch that the UDF employee had called 911, they were sitting in marked cruisers in a parking lot located directly across from both the UDF and Bitola's Bar, which was "normally" where they would sit when monitoring Bitola's Bar, as they were that night. The officers were monitoring Bitola's Bar because there had been "many problems" there in the past. Officer Joe DeVictor testified that fights at Bitola's Bar were "a common occurrence" at and after the bar's closing time. Moreover, clerks at the UDF frequently contacted police about activity in and around the store. While it is well-established that an individual's presence in a high-crime area is not by itself sufficient to warrant a Terry stop, "`[t]he reputation of an area for criminal activity is an articulable fact upon which a police officer may legitimately rely' in determining whether an investigative stop is warranted."Bobo, supra, at 179, quoting United States v. Magda (C.A.2, 1976), 547 F.2d 756, 758, certiorari denied (1977), 434 U.S. 878,98 S.Ct. 230. Further, the time of night is a proper consideration. Bobo, at 178. In this case, the officers received the dispatch at 2:45 a.m., which the officers testified was when there was often trouble at or around the bar.
 {¶ 13} Also compelling is that the officers involved in the present case had considerable experience. At the time of the stop, Officers Glen Siniff, DeVictor, and Brian Rose had been members of the Columbus Police Department for over 20 years, 10 years, and nearly 5 years, respectively. As noted above, a court must give due weight to the experience and training and view the circumstances as they would be understood by those in law enforcement. Andrews, supra, at 88. In addition to the officers' familiarity with the bar and the area, Officer DeVictor testified that his suspicion of criminal activity was based upon the following rationale:
Well, based on what the caller had said, that the man was upset and frantic and said, you know, bring a gun, we thought, well, this can't be good. And if somebody is coming to go pick him up, you know, hopefully, they're getting him out of the area, but, you know, a gun could be involved and that's what the run said. * * *
According to Officer DeVictor, the dispatch also indicated that O'Connor asked the second party to his telephone conversation to "get here quickly[.]" Therefore, in accordance with the officer's testimony, while "upset and frantic" the man requested that another person bring a gun and do so "quickly." These actions do not suggest that he was requesting the firearm for lawful purposes; rather, these qualities tend to resolve the ambiguity of his actions in favor of imminent criminal activity. SeeBobo, at 178-179 (suspect's conduct and appearance is a relevant factor); Andrews, at 88 (same). The officer's testimony was not mentioned in the trial court's analysis. However, even omitting the testimony regarding "frantic" from our consideration, a request for a gun at 2:45 a.m. would tend to raise suspicion and it could not be said this suspicion would be unreasonable. It is clear that O'Connor's otherwise legal actions, in the context of the time of night and the reputation of the area, created an ambiguity in the minds of the officers. The officers decided to resolve the ambiguity before O'Connor and appellee drove away.
 {¶ 14} Another consideration in determining whether the initial stop was lawful is the relative intrusiveness of the stop. See Terry, supra, at fn.15; United States v. Rickus
(C.A.3, 1984), 737 F.2d 360, 366. In this case, one of the officers testified that appellee's vehicle had not yet begun to drive away when they approached the vehicle and addressed its occupants. The officers further testified that there were no people in the area other than O'Connor and appellee. There is no suggestion that the officers in this case attempted to harass or intimidate appellee or O'Connor and, given the late hour and relatively deserted character of the parking lot and surrounding area, the initial stop involved no public embarrassment. Id. Thus, the relative intrusiveness of the stop was slight compared with the government's interest in preventing violent crime.
 {¶ 15} "In allowing such detentions, Terry accepts the risk that officers may stop innocent people. Indeed, theFourth Amendment accepts the risk in connection with more drastic police action; persons arrested and detained on probable cause to believe they have committed a crime may turn out to be innocent. The Terry stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further." Wardlow, supra, at 126. In this case, after the stop, and the attendant protective patdown allowed under Terry, if the officers had not learned facts rising to the level of probable cause to arrest appellee, he should have been allowed to proceed on his way. But the officers found appellee with a handgun in his pocket and arrested him.
 {¶ 16} We note that, although the officers testified that after removing O'Connor from the vehicle he had scraped knuckles and muddy clothes and told them he had been in a fight at Bitola's Bar, this testimony is irrelevant to our reasonable suspicion analysis. The components of a determination of reasonable suspicion are the events that occur leading up to the stop or search. See Ornelas v. United States (1996),517 U.S. 690, 696, 116 S.Ct. 1657. The testimony at the motion hearing confirmed the fact that appellee was not free to leave once the officers activated their overhead beacons and detained appellee's vehicle. Thus, after this point, the information obtained could not be used to form reasonable suspicion.
 {¶ 17} Although this is a very close case, based upon an examination of the totality of the circumstances — the officers' level of experience, the dispatch indicating someone would be bringing a gun, the time of night, the location in an area known for criminal activity, and the fact that the officers were already engaged in surveillance of the area at the time they received the dispatch — together with rational inferences from those facts, we conclude that the officers had reasonable suspicion to believe that criminal activity was afoot. Thus, their initial stop of appellee's vehicle was a reasonable investigatory stop and did not abridge the protections guaranteed by the Fourth Amendment. Therefore, we sustain the state's sole assigned error.
 {¶ 18} Accordingly, the state's single assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas is reversed, and this matter is remanded to that court for further proceedings in accordance with law, consistent with this opinion.
Judgment reversed and cause remanded.
Sadler, J., concurs.
Bryant, J., dissents.