[Cite as *State v. Simon*, 2025-Ohio-5660.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 30443 |
| Appellee | : | |
| | : | Trial Court Case No. 2024 CR 00791 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| JUSTIN Q. SIMON | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on December 19, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

RONALD C. LEWIS, JUDGE

TUCKER, J., and HANSEMAN, J., concur.

CHIMA R. EKEH, Attorney for Appellant
MICHAEL P. ALLEN, Attorney for Appellee

LEWIS, J.

{¶ 1} Defendant-Appellant Justin Q. Simon appeals from his convictions for aggravated possession of drugs following a jury trial in the Montgomery County Common Pleas Court. For the following reasons, we affirm the judgment of the trial court.

## I. Course of Proceedings

{¶ 2} On April 10, 2024, Simon was indicted by a Montgomery County grand jury on one count of aggravated possession of drugs (greater than or equal to 50 times bulk amount but less than 100 times bulk amount), a first-degree felony (Count 1); two counts of aggravated possession of drugs (greater than or equal to 5 times bulk amount but less than 50 times bulk amount), second-degree felonies (Counts 2 and 3); two counts of aggravated possession of drugs (Schedule I or II), fifth-degree felonies (Counts 4 and 5); and one count of possession of drugs (Schedule III, IV, or V), a first-degree misdemeanor (Count 6). The charges arose from a traffic stop during which several drugs were confiscated from a backpack found in the vehicle Simon was driving.

{¶ 3} Simon filed a motion to suppress all evidence obtained from his traffic stop. Following a hearing, it was overruled. Simon filed a motion to reconsider, which the trial court denied.

{¶ 4} The case proceeded to a jury trial, after which Simon was found guilty as charged. At sentencing, the trial court merged Count 4 into Count 2 and Count 5 into Count 3. The trial court imposed a mandatory indefinite prison sentence of a minimum of four

years to a maximum of six years on Count 1; a mandatory stated prison term of four years on each of Counts 2 and 3; and 180 days in jail on Count 6. The court ordered all the sentences to be served concurrently.

{¶ 5} Simon timely appealed, raising two assignments of error.

## II. Motion to Suppress

{¶ 6} In his first assignment of error, Simon argues that the trial court erred in overruling his motion to suppress. Simon first contends that the trial court improperly relied on the collective knowledge doctrine because the officer who initially observed the basis for the traffic violation did not testify at the suppression hearing. Alternatively, he argues that even if there were a lawful basis to stop his vehicle, there was no reasonable, articulable suspicion to extend the length of the stop to conduct a canine sniff.

### a. Standard of Review

{¶ 7} An appeal from a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Codeluppi*, 2014-Ohio-1574, ¶ 7, citing *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Burnside* at ¶ 8, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). As a result, we must accept the trial court's findings of fact if they are supported by competent and credible evidence. *Id.*, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). "'Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.'" *State v. Koon*, 2015-Ohio-1326, ¶ 13 (2d Dist.), quoting *Burnside* at ¶ 8. The trial court's application of law to the findings of fact is reviewed de novo. *State v. Shepherd*, 2021-Ohio-4230, ¶ 10 (2d Dist.).

3

### b. Motion to Suppress Evidence and Trial Court's Decision

{¶ 8} The following evidence was submitted at the motion to suppress hearing. Dayton Police Officers Wayne Hammock ("Hammock") and Vincent Carter ("Carter") were assigned to West Patrol, which covered the western division of the City of Dayton. Hammock had been a police officer for over eight years, and Carter had been a police officer for about nine years.

{¶ 9} On January 25, 2024, Hammock and Carter were partnered together and assigned to assist the narcotics unit. They drove a marked patrol car and wore the uniform of the day. Dayton narcotics detectives were surveilling various locations and noticed a green BMW that had stopped at one of the locations the detectives were surveilling. Narcotics Detective Dustin Phillips ("Phillips") alerted Hammock and Carter to a green BMW that had excessively dark window tint. Phillips followed the BMW until Hammock, who was driving, located it and got behind it. When the BMW turned onto James H. McGee Boulevard, Hammock also observed that it had excessively dark window tint. Hammock was trained to detect illegal window tint and had made hundreds of traffic stops based on that violation. Before initiating a traffic stop on the BMW, Hammock ran the license plate, which was a dealer tag. Hammock was aware that when a car has dealer tags, the vehicle should not be operated unless it is conducting dealership business, which includes test drives or transportation of the vehicle to and from dealerships. The officers also requested a canine officer to conduct a free-air sniff.

{¶ 10} When officers stopped the BMW on James H. McGee Boulevard near Hoover Avenue, Simon was the driver and sole occupant of the vehicle. Hammock's initial contact with Simon occurred at 2:03 p.m. Simon's license was suspended, but he provided Hammock paperwork reflecting that he had limited driving privileges to drive to and from his

4

residence in Cincinnati, Ohio, to his place of employment on Siebenthaler Avenue in Dayton, Ohio.

{¶ 11} While awaiting the arrival of the canine officer, Simon was removed from the vehicle. He was not handcuffed but was told he was being detained for a traffic investigation. Simon stood outside the car with Carter while Hammock returned to the police cruiser. When Hammock ran Simon's information through LEADS, a law enforcement database, there was no indication that Simon had any driving privileges.

{¶ 12} Hammock measured the front driver's side window tint of the vehicle, which measured 38 percent light transmittance. The law requires that the tint level be above 50 percent light transmittance so that the driver and occupants can be identified. Based on the tint violation and Simon driving without a valid license, Hammock wrote a traffic citation and called for the vehicle to be towed.

{¶ 13} At 2:12 p.m., while Hammock worked on the citation, Dayton Police Officer Michael Conrads ("Conrads") arrived on scene to do a free-air sniff with his canine partner Maverick. Conrads, a Dayton police officer for over 10 years, completed specialized training to be a canine officer with Maverick in June 2022. Maverick was trained to detect cocaine, methamphetamine, heroin, and their derivatives, but not marijuana. Both Conrads and Maverick had valid certifications for drug detection, tracking, and article search at the time of the traffic stop.

{¶ 14} Conrads began a free-air sniff on Simon's vehicle at 2:13 p.m. He started at the BMW's back bumper and walked Maverick around the car on a leash. Maverick alerted to the odor of illegal narcotics at the front driver's side door at 2:14 p.m. A search of the vehicle was conducted by officers on scene while Hammock worked on the citation.

5

**{¶ 15}** At 2:18 p.m., Hammock contacted the traffic services unit to inquire about Simon's driving privileges. He was informed that a person with driving privileges to and from work must take the most direct route without any stops or errands. According to Hammock, based on the location of the traffic stop, Simon had not taken the most direct route, and furthermore, based on the narcotics detective's surveillance, Simon did not leave work and drive directly home. Simon told Carter that he had left work, picked up food, and was going to pick up his children from school in Cincinnati.

**{¶ 16}** Carter located a backpack in the BMW that had a luggage lock on it. Simon claimed that it belonged to one of his children and that he did not know the combination. Carter observed clear, vacuum-sealed bags inside the backpack through a small opening. Based on his training and experience, Carter knew that narcotics are commonly packaged in vacuum-sealed bags. The officers cut the backpack open and discovered a large number of drugs and a scale. At that point, Simon was placed in handcuffs and arrested.

**{¶ 17}** The trial court found that the officers had reasonable suspicion to detain Simon for a traffic violation for having excessive window tint based on Phillips's relayed observations. The court further found that the timing of the free-air sniff did not unlawfully prolong the investigation. Upon Maverick's positive alert on the vehicle, the officers had probable cause to search it. Drugs and drug paraphernalia were found, which then gave officers probable cause to arrest Simon. Accordingly, the court overruled Simon's motion to suppress.

### c. Initial Traffic Stop

**{¶ 18}** "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v. Emerson*, 2012-Ohio-5047, ¶ 15. "The touchstone of the Fourth Amendment is

6

reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991), citing *Katz v. United States*, 389 U.S. 347, 360 (1967). Whether a search and seizure is reasonable under the Fourth Amendment depends upon the particular facts and circumstances of the case, viewed objectively by examining the totality of the circumstances. *State v. Leak*, 2016-Ohio-154, ¶ 14.

{¶ 19} A traffic stop constitutes a seizure under the Fourth Amendment and, therefore, must be reasonable under the circumstances. *Whren v. United States*, 517 U.S. 806, 809-810 (1996). "A police officer may stop and detain a motorist when he [or she] has a reasonable and articulable suspicion that the motorist has committed, is committing, or is about to commit any criminal offense, including a traffic offense, and no independent reasonable and articulable suspicion of other criminal activity is required under *Terry* [*v. Ohio*, 392 U.S. 1 (1968)]." *State v. Chase*, 2013-Ohio-2347, ¶ 17 (2d Dist.), citing *State v. Stewart*, 2004-Ohio-1319, ¶ 13 (2d Dist.), and *Dayton v. Erickson*, 76 Ohio St.3d 3 (1996).

{¶ 20} "The propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances." *State v. Freeman*, 64 Ohio St.2d 291, (1980), paragraph one of the syllabus. "[T]hese circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Andrews*, 57 Ohio St.3d 86, 87-88 (1991), citing *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir. 1976); *Freeman* at 295.

{¶ 21} "[C]ourts have recognized the 'collective knowledge doctrine,' which permits police officers to rely on information provided to them by other officers in helping to establish probable cause or reasonable suspicion." *State v. Jones*, 2011-Ohio-1984, ¶ 20 (2d Dist.). "'Reasonable suspicion [or probable cause] may exist based upon the collective knowledge of the police when there is reliable communication between the officer supplying the

7

information and the officer acting on that information.'"   *State v. Freeman*, 2015-Ohio-2501, ¶ 16 (9th Dist.), quoting *State v. Mook*, 1998 WL 417461, *3 (9th Dist. July 15, 1998).   This case implicates vertical collective knowledge, which "involves 'situations where one officer *has* probable cause and instructs another officer to act, but does not communicate the corpus of the information known to the first officer that would justify the action.'"   (Emphasis in original.) *State v. Ojezua*, 2016-Ohio-2659, ¶ 32 (2d Dist.), quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008).

{¶ 22} "We have repeatedly held that a traffic stop for a suspected window-tint violation is lawful."   *State v. Davenport*, 2017-Ohio-688, ¶ 18 (2d Dist.) (collecting cases). Ohio law requires that where front side windows are tinted, the window must have a light transmittance of not less than 50 percent plus or minus 3 percent.   Adm.Code 4501-41-03(A)(3).

{¶ 23} Though Simon concedes that an excessively dark window tint justifies a lawful traffic stop, he argues that the trial court could not rely upon the collective knowledge doctrine because Phillips did not testify at the suppression hearing to "corroborate [Hammock's] observations and allow for cross-examination."   Appellant's Brief, p. 8. According to Simon, "the State waived any reliance on the collective knowledge doctrine by failing to have Det. Phillips testify at the suppression hearing."   *Id*.   We disagree.

{¶ 24} "Though nothing would prohibit the state from calling every officer who was involved in relaying or receiving the information, the critical inquiry for a court in considering a motion to suppress based on the collective knowledge doctrine is whether the facts precipitating the dispatch supported a finding of reasonable suspicion."   *State v. Muldrow*, 2016-Ohio-4774, ¶ 21 (10th Dist.), citing *State v. Taylor*, 2006-Ohio-5866, ¶ 7 (10th Dist.). Here, the evidence demonstrates that Phillips had personally observed Simon's green BMW

8

with excessively dark window tint. Phillips communicated that information and a description of the vehicle to Hammock with whom he was working that day. Phillips followed the suspect vehicle until Hammock located it. Under the collective knowledge doctrine, Phillips's communication imputed his knowledge to Hammock. Accordingly, Hammock was competent to testify regarding the excessively dark window tint violation precipitating the traffic stop, even before he personally observed the violation. *State v. Adams*, 2017-Ohio-7186, ¶ 25 (10th Dist.).

{¶ 25} Regardless, when Hammock caught up to Simon's vehicle, he personally observed the excessive window tint on Simon's driver's side window, which alone was a sufficient basis to justify a traffic stop. Hammock was trained to detect illegal window tint and had made hundreds of traffic stops based on that violation. When Hammock tested the vehicle's driver side window, the tint measured at only 38 percent light transmittance. Based on this evidence, we conclude that the trial court did not err when it found that there was reasonable, articulable suspicion to stop Simon's vehicle based on a suspected window tint violation.

### d. Continued Detention

{¶ 26} According to Simon, the traffic stop was unconstitutionally prolonged because Hammock spent too much time investigating Simon's driving privileges before the canine alerted on his vehicle. The State responds that Hammock was diligently conducting his investigation into the traffic stop throughout the encounter and had not yet completed his investigation when the canine alerted on the BMW. Therefore, the stop was not unreasonably prolonged. We agree with the State.

{¶ 27} "[A]n officer who has properly executed a traffic stop may make ordinary inquiries necessary to complete the mission of the traffic stop – including confirming that the

9

driver has a valid driver's license." *State v. Dunlap*, 2024-Ohio-4821, ¶ 2. However, "[t]he duration of a traffic stop may last no longer than is necessary to resolve the issue that led to the original stop, absent some specific and articulable facts that further detention was reasonable." *State v. Ramos*, 2003-Ohio-6535, ¶ 10 (2d Dist.), citing *State v. Chatton*, 11 Ohio St.3d 59 (1984). "In determining if an officer completed the tasks of a traffic stop within a reasonable length of time, the court must evaluate the duration of the stop in light of the totality of the circumstances and consider whether the officer diligently conducted the investigation." *State v. Thomas*, 2009-Ohio-3520, ¶ 14 (2d Dist.), citing *State v. Batchili*, 2007-Ohio-2204, ¶ 12.

{¶ 28} A canine free-air sniff of the exterior of a vehicle lawfully detained for a traffic stop does not constitute a "search" under the Fourth Amendment. *State v. Kuralt*, 2005-Ohio-4529, ¶ 11 (2d Dist.), citing *Illinois v. Caballes*, 543 U.S. 405 (2005). "Accordingly, a police officer need not have a reasonable suspicion that a vehicle contains contraband prior to summoning a canine drug unit." *State v. Wilkins*, 2004-Ohio-3917, ¶ 12 (2d Dist.). Nevertheless, "an officer may not prolong a traffic stop to perform a drug sniff even if the 'overall duration of the stop remains reasonable in relation to the duration of other stops involving similar circumstances.'" *State v. Hall*, 2017-Ohio-2682, ¶ 13 (2d Dist.), quoting *Rodriguez v. United States*, 575 U.S. 348, 357 (2015). "[A]bsent reasonable suspicion of criminal activity, the extension of a traffic stop to allow a drug-detecting dog to sniff the vehicle violates the Fourth Amendment." *State v. Vega*, 2018-Ohio-4002, ¶ 17, citing *Rodriguez*. "If a trained canine alerts to the odor of drugs from a lawfully stopped and detained vehicle, an officer has probable cause to search the vehicle for contraband." *Thomas* at ¶ 15, citing *State v. Heard*, 2003-Ohio-1047, ¶ 17 (2d Dist.).

**{¶ 29}** Video of the traffic stop reflects that it was initiated at 2:03 p.m. After contacting Simon, Hammock ran Simon's information and checked the vehicle identification number ("VIN") on the expired insurance information, which belonged to a different vehicle. Simon explained that the VIN belonged to a vehicle he had wrecked, and the vehicle involved in the traffic stop was the dealer's vehicle. Hammock verified the window tint at 2:09 p.m., returned to his cruiser, and began writing a traffic citation. The canine arrived on scene at 2:13 p.m. and positively alerted on the car at 2:14 p.m., all while Hammock remained in his vehicle writing the traffic citation. It was not until 2:18 p.m., four minutes after Maverick alerted on the vehicle, that Hammock contacted the traffic services unit to further inquire about Simon's driving privileges. Thus, Simon's argument that Hammock's investigation of Simon's driving privileges unduly prolonged the traffic stop to get a canine unit is belied by the record.

**{¶ 30}** There is no evidence to suggest that Simon's detention for the traffic violation was unreasonably extended so that a canine could conduct a free-air sniff. "A traffic stop is not unconstitutionally prolonged when permissible background checks have been diligently undertaken and not yet completed at the time a drug dog alerts on the vehicle." *Batchili*, 2007-Ohio-2204, at ¶ 14. Because Hammock did not extend Simon's detention beyond what was reasonably necessary to resolve the issues associated with the traffic stop and issue a citation, the trial court did not err in overruling Simon's motion to suppress.

**{¶ 31}** Simon's first assignment of error is overruled.

### III. Sufficiency of the Evidence

**{¶ 32}** Simon's second assignment of error claims there was insufficient evidence that he knowingly possessed the drugs. We disagree.

11

### a. Standard of Review

{¶ 33} "A claim of insufficient evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the verdict as a matter of law." *State v. Hunter*, 2011-Ohio-6524, ¶ 118, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Groce*, 2020-Ohio-6671, ¶ 7, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. When considering the legal sufficiency of the evidence, appellate courts do not engage in a determination of witness credibility. *State v. Goff*, 82 Ohio St.3d 123, 139 (1998), citing *State v. DeHass*, 10 Ohio St.2d 230 (1998), paragraph one of the syllabus. "The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo." *State v. Campbell*, 2016-Ohio-598, ¶ 6 (2d Dist.), citing *Thompkins* at 386.

### b. Evidence Submitted at Trial

{¶ 34} Hammock, who had transitioned to working in the homicide unit of the Dayton Police Department at the time of trial, testified first on behalf of the State. He stated that on January 25, 2024, he was working as a road patrol officer with his partner, Carter. They wore the uniform of the day and drove a marked police cruiser.

{¶ 35} While on patrol, Hammock and Carter were alerted over the radio by Phillips to a green BMW with illegally tinted windows. Phillips had observed the vehicle leaving an area in which narcotics unit officers were conducting surveillance. As the vehicle made a left turn from Gettysburg Avenue onto James H. McGee Boulevard, Hammock observed the tinted windows and initiated a traffic stop. Before the stop, Carter had requested a canine

unit to respond. When the officers ran the license plate, they observed that it had a dealer's tag on it, which is a license plate dealerships place on vehicles to conduct test drives or to transport cars to and from dealerships.

{¶ 36} Hammock contacted Simon, the sole occupant and driver of the vehicle. Simon had a suspended driver's license but provided paperwork for limited driving privileges along with his driver's license. Simon acted nervous and was asked to get out of the car. Carter stayed with Simon while Hammock returned to the cruiser to run Simon's information. While Hammock investigated the traffic violations, the canine officer arrived on scene, and the dog positively alerted to the odor of narcotics coming from the vehicle. Carter assisted in the search of the vehicle while Hammock worked on the traffic citation.

{¶ 37} Carter located a backpack in the vehicle that had a TSA lock on it. Simon claimed that the backpack belonged to his 12-year-old child. The zipper opened just enough to look inside. Using his flashlight, Hammock observed pink-colored pressed pills. Hammock cut open the backpack to retrieve the drugs. Inside the backpack was a large bag of pink-pressed pills and some rectangular shaped pills, which the officers believed were Xanax. In addition to the drugs, the backpack contained fentanyl test strips, a box of clear plastic sandwich bags, gloves, a metal tin, and a scale. At that time, there was a growing trend to press fentanyl into pill form, and Hammock suspected the pink-colored pressed pills were fentanyl. The officers did not conduct a field test of the drugs due to the dangerousness of fentanyl.

{¶ 38} During the traffic stop, Simon made statements indicating that he had just bought the vehicle, and then he later made comments about selling the vehicle. The vehicle was impounded at the end of the traffic stop.

13

**{¶ 39}** When the officers transported Simon to the Montgomery County Jail, Simon asked what offenses he was going to be charged with. After Hammock informed Simon he was going to be charged with possession of fentanyl, Simon responded "that's not fentanyl." Tr. 94.

**{¶ 40}** Carter testified that he was assigned as a detective in the narcotics bureau at the time of trial. Prior to being a narcotics detective, he worked as a patrol officer in the West Patrol community problem response team that specialized in curtailing violent crime, drugs, and guns in the west Dayton area. Carter's testimony at trial was consistent with Hammock's testimony regarding the traffic stop of Simon on January 25, 2024.

**{¶ 41}** During the search of the BMW, Carter located a black backpack on the front passenger seat, although he did not recall where it was first observed in the vehicle. The backpack had a TSA lock on it, but there was enough room between the zippers to look inside the backpack. Carter observed vacuum-sealed bags, which he knew from training and experience were often used to transport large quantities of narcotics. Carter was also aware that people often put illegal narcotics or contraband in bags to make them quickly accessible and transport them. Simon told Carter that the backpack belonged to one of his children, who were 12- and 14-years old. Hammock opened the backpack with a knife because Carter did not have one with him.

**{¶ 42}** Simon also had a wallet and some prescription bottles in the vehicle. The officers located $1,098, which was confiscated.

**{¶ 43}** Phillips testified that he had been a detective in the Dayton Police Department Narcotics Bureau for about 12 years and had approximately 5 years of road patrol experience prior to becoming a detective. Phillips had been a task force officer with the FBI

14

Safe Streets Task Force ("Task Force") for 10 years, which focused on higher level drug crimes and crimes of violence.

{¶ 44} The Task Force focused on areas of the city that they had identified as hotspots, meaning areas that statistically had high-crime, high-drug activity, and a high propensity for violence. In January 2024, the top four hotspot areas included the upper Gettysburg Avenue area from Gettysburg Avenue and Hillcrest to the north; the upper North Main Street area, which included primarily Hillcrest to Siebenthaler Avenue on North Main Street; the DeSoto Bass housing complex; and the intersection near Third Street and Gettysburg Avenue. Phillips conducted surveillance in the hotspot areas to seek out vehicle-to-vehicle or hand-to-hand drug transactions.

{¶ 45} On January 25, 2024, Phillips was in an unmarked vehicle wearing civilian clothing that had nothing on them that could identify him as a police officer. He was conducting surveillance in the area of Hillcrest between Salem and Gettysburg Avenues. Phillips first observed Simon's green BMW when Simon was driving on Hillcrest and turned onto Chamberlin Avenue, which was just outside the Dayton city limits. Once on Chamberlin Avenue, Simon pulled over to the side of the road and stopped. Phillips did not observe anyone get out of the parked car. He noticed the BMW was very clean and not beat up and had dark window tint. That area of town was run down and was a high-crime area. Because it was a nice vehicle in an impoverished area, it caught Phillips's attention. As Phillips continued to watch Simon's car, a person walked over to the passenger side of the BMW, got in the front passenger seat for two to three minutes, and then got out and walked out of view. As soon as the person got out of the BMW, Simon drove away.

{¶ 46} In Phillips's experience, it was very common for drug transactions to occur inside vehicles, and Simon had stopped in a very high-crime area, known for drug

15

possession and drug trafficking. Phillips had made undercover drug purchases and multiple arrests for drug possession and drug trafficking in the immediate vicinity. Based on his observations, Phillips believed that Simon had potentially conducted a drug transaction in his car. When Simon drove off, Phillips followed the BMW and called Hammock and Carter to assist him. Phillips followed Simon to North Gettysburg Avenue and observed Simon fail to use a turn signal within 100 feet of a turn when Simon turned onto Kings Highway. Once Simon was within Dayton city limits, Phillips relayed the traffic violations to Hammock and Carter to conduct a traffic stop.

{¶ 47} After the officers found the drugs in the backpack, Phillips arrived on scene. Phillips collected and packaged the items found in the backpack during the traffic stop. No personal identification items were recovered from inside the backpack. Phillips also collected two cell phones that were found in the car. Although he obtained search warrants for the phones, they were unable to be accessed by the time of trial. The drugs were submitted to a crime lab for testing. The backpack itself was not collected, which was an oversight.

{¶ 48} Based on Phillips's training and experience, a large quantity of drugs was recovered that was consistent with "a street dealer amount of drugs." Tr. 147. According to Phillips, drug trafficking was largely a cash business, and the approximate value of the drugs in the backpack was $3,000. Based on the value of the drugs, he believed it was "highly unlikely" for someone to forget the backpack in someone else's vehicle. Tr. 149. He further testified that had someone inadvertently left the backpack in the car, based on the value of the drugs, they would likely have returned to retrieve it.

{¶ 49} Although there were dealer plates on the BMW, Phillips perceived the interior to be consistent with "a person's vehicle as opposed to a dealership's vehicle." Tr. 145.

16

The seats were "beat up" and had seat covers on them.   The vehicle contained phone chargers, change in the cup holders, and Simon's medication bottles in the back seat.   The BMW was towed and eventually returned to a dealership out of Cincinnati.

{¶ 50} Alexis Smith, a forensic scientist from the Hamilton County Crime Lab, testified regarding her analysis of the drugs recovered during the traffic stop.   Smith stated that based on hypergeometric sampling, the submission of 51 white rectangular tablets weighed 12.092 grams, plus or minus 0.005 grams, and contained bromazolam and clonazolam, both Schedule I controlled substances.   Neither of those drugs was available by prescription. Rather, they were chemically altered from prescription medications.   Tr. 168.

{¶ 51} Smith also tested a single orange tablet of a collection of tablets, which she found to contain methamphetamine.   The single tablet weighed 0.385 grams, plus or minus 0.005 grams.   She did not test the remaining collection of similar tablets, which were consistent in appearance to the single tested tablet.

{¶ 52} A separate analysis was conducted on a set of 492 tablets that weighed a total of 181.256 grams, plus or minus 0.005 grams.   Smith determined that these tablets contained methamphetamine, a Schedule II controlled substance.   Smith explained that the bulk amount of methamphetamine is 3 grams, so 50 times the bulk amount is 150 grams and 100 times the bulk amount is 300 grams.

{¶ 53} In another testing sample, Smith tested a single white tablet that weighed 0.235 grams, plus or minus 0.005 grams, and contained bromazolam and clonazolam. Another blue tablet was tested in a sample that weighed 0.255 grams, plus or minus 0.005 grams, and contained bromazolam.   Finally, an analysis of 4 partial green tablets that weighed a total of 0.460 grams, plus or minus .005 grams, revealed the presence of alprazolam, a Schedule IV controlled substance.

17

**{¶ 54}** Following the State's presentation of evidence, Simon testified on his own behalf. He stated that he owned a nail salon on West Siebenthaler in Dayton and lived in Cincinnati. On January 25, 2024, Simon took his children to school then returned home and went to the gym. Although Simon testified that he drove his children around in the green BMW that was the subject of the traffic stop, he also stated that after the gym, he went to Real Deal Auto Sales, a private dealership in Cincinnati, where they gave him the loaner green BMW for the first time. Simon had known the owner of the dealership for four or five years and had exchanged cars with him previously. Simon's own BMW was in the shop because of an issue with the sensors, and they were going to need Simon's car for a couple of days to repair it.

**{¶ 55}** Simon had previously owned the green BMW but had sold it to the car dealership. He stated that he had been in a car accident in 2020, and the BMW was deemed totaled. Though the damage could have been repaired, it was too costly for Simon to pay to fix it, so he sold it to the dealership. He was pretty sure someone else had driven the BMW after it was sold to the dealership and fixed, but he did not know who. Due to his relationship with the owner of the dealership, Simon did not sign any paperwork to obtain the loaner vehicle.

**{¶ 56}** Simon received the green BMW around 12:00 p.m. on January 24, 2024. The vehicle was not clean on the inside, and the interior was not in great condition, which is why there were seat covers. The seat covers were not Simon's and there was "stuff" in the back. He did not check the trunk or go through the car before he obtained it from the dealership. He was not aware of the black backpack in the back of the car.

**{¶ 57}** When Simon got pulled over, he knew his driver's license was suspended, but he had driving privileges. He told Hammock that the tint on the vehicle was how he bought

the car.   Simon denied being nervous when the officer first made contact with him, but admitted he was "super nervous" when the officer informed him that his license was not valid.   Tr. 201.

{¶ 58} Simon talked to Carter about the BMW and informed him that the vehicle was going to be sold the next day, which is why it had the dealer plates on it.   He implied to Carter that he owned a car lot and that he got the BMW from the car lot.   Simon admitted that he lied to Carter during the traffic stop but claimed he was telling the truth at trial.

{¶ 59} Simon denied having seen the black backpack before it was pulled out of the car.   He did not know the combination to the lock on the backpack because it did not belong to him.   Simon did not recognize the backpack but said that it may have belonged to one of his children.   When the officers discovered drugs in the backpack, he knew it did not belong to his children.

{¶ 60} Simon's anxiety medication and inhalers were in the vehicle in a black medicine bag; they were not in the backpack.   Simon usually kept his medicine in the front seat, but because he had dropped his children off, he was not sure where the children had moved his medicine bag.

{¶ 61} After the BMW was impounded, Simon called the dealer and told him what happened.   The dealer then picked up the car.

### c.  Sufficient Evidence

{¶ 62} For each of Simon's four convictions, the State was required to prove that he knowingly obtained, possessed, or used the relevant controlled substances in the various amounts alleged in the indictment.   Indictment; R.C. 2925.11(A).   Simon does not challenge the amounts or types of controlled substances; he challenges only whether he knowingly possessed the drugs.

19

{¶ 63} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." *Id*. "[W]hether a person charged with drug abuse in violation of R.C. 2925.11 knowingly possessed, obtained, or used a controlled substance is to be determined from all the attendant facts and circumstances available." *State v. Teamer*, 82 Ohio St.3d 490, 492 (1998).

{¶ 64} For purposes of drug offenses, "'[p]ossess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). "Possession of a drug may be either actual physical possession or constructive possession." *State v. Mabry*, 2007-Ohio-1895, ¶ 18 (2d Dist.), citing *State v. Butler*, 42 Ohio St.3d 174 (1989). "Constructive possession exists when an individual exercises dominion and control over an object, even though that object may not be within his immediate physical possession." *State v. Wolery*, 46 Ohio St.2d 316, 360 (1976).

{¶ 65} "The State may prove constructive possession solely through circumstantial evidence as circumstantial evidence and direct evidence have the same probative value." (Cleaned up.) *State v. Ramos*, 2019-Ohio-3588, ¶ 44 (2d Dist.). "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the

20

facts sought to be proved.'" *State v. Nicely*, 39 Ohio St.3d 147, 150 (1988), quoting *Black's Law Dictionary* (5th Ed. 1979). "Readily usable drugs found in very close proximity to a defendant may constitute circumstantial evidence sufficient to support a conclusion that he constructively possessed those drugs." *State v. Battle*, 2007-Ohio-2977, ¶ 20 (2d Dist.), citing *State v. Miller*, 2002-Ohio-4197 (2d Dist.).

{¶ 66} Phillips's observations of Simon prior to the traffic stop were consistent with Simon having had knowledge of the drugs. Simon stopped his car in a high-crime, high-drug area, a person got in Simon's car for two to three minutes, and then Simon left the area immediately after the person got out of his car. Phillips testified that these actions were indicative of a drug transaction.

{¶ 67} At the time of the traffic stop, Simon was the sole occupant of the vehicle, and the backpack was easily accessible to him, regardless of whether it was located in the front seat or the back seat of the passenger compartment of the vehicle. In addition to the backpack, Simon had medications, a wallet, change in the cupholder, a charger, and two cell phones in the vehicle. Police recovered over $1,000 in Simon's possession. At trial, Simon testified that there was "stuff" in the car when he received it from the dealership, implying that some unknown person had left the backpack in the loaner vehicle. According to Phillips's testimony, however, based on the value of the drugs inside the backpack, it was unlikely that anyone would have left it behind, and further, had someone left it in the vehicle, they would have gone back to retrieve it.

{¶ 68} Furthermore, when Simon was informed that he was being charged with possession of fentanyl, he responded that it was not fentanyl. Although the officers suspected some of the drugs were fentanyl, laboratory analysis confirmed they were other controlled substances, namely, methamphetamine, bromazolam, clonazolam, and

21

alprazolam. Simon's unsolicited and correct statement about the type of drugs not in the backpack confirmed his knowledge about the drugs contained within the backpack.

{¶ 69} Simon's testimony that he had no knowledge of the contents of the backpack and that it did not belong to him does not render the verdict insufficient. The jury was under no obligation to accept Simon's testimony as truthful. *State v. Carter*, 72 Ohio St.3d 545, 554 (1995). In viewing the evidence in the light most favorable to the State, a rational factfinder could have reasonably concluded that Simon was in constructive possession of the drugs. Moreover, establishment of ownership was not a requirement of the offense. *State v. Rastbichler*, 2014-Ohio-628, ¶ 33 (2d Dist.); R.C. 2925.11(A).

{¶ 70} The facts and circumstances of this case reflect that a reasonable trier of fact could find that Simon knowingly possessed the drugs, and therefore, his convictions for aggravated possession of drugs were supported by sufficient evidence. Simon's second assignment of error is overruled.

## IV. Conclusion

{¶ 71} Having overruled all the assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

TUCKER, J., and HANSEMAN, J., concur.